# CLARK v. MISSOURI, KANSAS & TEXAS RAILWAY COMPANY, Appellant.

### Division One, December 23, 1903.

1. **Appellate Jurisdiction:** CONFLICT OF DECISIONS. The jurisdiction of the Supreme Court 'over the appeal in a case certified to it by a Court of Appeals on the ground that one of the judges of said court deems the decision therein to be in conflict therein with previous decisions of a Court of Appeals or of the Supreme Court, does not in anywise depend on the fact of whether or not there is in reality a conflict, but solely on the fact that one of the judges of the Court of Appeals deems such conflict to exist.

2. **Admissions:** FORMAL PLEADINGS: TAKEN AS A WHOLE. An admission of a litigant's adversary contained in an abandoned pleading must be taken as a whole. The good must go with the bad. The party introducing the admissions can not use the part which affects his adversary injuriously, and reject such parts as benefit him.

3. ————: ————: ————: TEXAS CATTLE. A charge in defendant's abandoned pleading that Texas cattle are vicious and dangerous to handle must be held to mean that the particular steer which escaped at the wreck of a train and which caused plaintiff's injury while he was trying to recover him, was also vicious and dangerous to handle.

4. **Texas Cattle:** ESCAPE IN WRECK: RECOVERY BY SECTION MEN: LIABILITY. Plaintiff who was a section man was ordered by his foreman to assist in the recovery of Texas cattle which had escaped from a wrecked train, and after peaceably putting all of them in the pen except one, he undertook with other section men to recover that one which plaintiff says when he first found him "acted wild," and that when a little later he ran violently towards him down the track he first tried to head him off, and then in trying to escape he ran down a steep embankment and was injured. He placed his right to recover on the ground that the defendant knew that this particular steer was vicious and dangerous and that the plaintiff was ignorant of that fact, and that defendant was negligent in not warning him of that fact, and that such fact and failure were the direct and proximate cause of his injuries. *Held,* that there being an absolute failure of any evidence that either the defendant or its foreman knew that this particular steer differed in any respect from the others, and plaintiff's evidence, and the other facts in the case, showing that he

knew as much about this particular steer for a sufficient length of time before he was placed in peril to be as much on his guard as he could possibly have been had he been duly warned, and further showing that the failure to give the warning was not, under the facts in evidence, the proximate cause of his injury, he can not recover. *Held*, also, that if running down the embankment was the cause of the injury, then there is no causal connection between a failure to give the warning and the injury, because the results would have been the same had warning been given.

5. **Character of Freight:** KNOWLEDGE OF CARRIER. A common carrier is not chargeable with notice of the character of the freight it carries.

Transferred from St. Louis Court of Appeals.

CIRCUIT COURT JUDGMENT REVERSED.

*Geo. P. B. Jackson* for appellant.

(1) The petition does not state a cause of action, and there was no evidence tending to show any negligence in sending the plaintiff after the Texas steer as alleged in the petition. The court should, therefore, have sustained the demurrer to plaintiff's evidence. Moreover it is not alleged that defendant failed to notify or warn plaintiff of the dangerous character of the steer, if it was necessary to do so. This question may be raised for the first time in this court, but in this case it was raised by the instructions and by the motion for new trial. Smith v. Burruss, 106 Mo. 94; Lilly v. Menke, 126 Mo. 211; Benham v. Bldg. Co., 60 Mo. App. 34; Childs v. Railroad, 117 Mo. 426; McPeak v. Railroad, 128 Mo. 635. (2) Even if the petition were sufficient, the plaintiff has failed to make out a case. He must establish two propositions, viz., negligence on the part of defendant, and due care on his own part. Wood's Master and Servant, sec. 382; Bailey on Master and Servant, pp. 111, 112, 113, 155 to 163, and 218 to 220; Ring v. Railroad, 112 Mo. 231; Jackson v. Railroad, 104 Mo. 456; Epperson v. Tel. Co., 50 S. W. 795;

Wormell v. Railroad, 79 Me. 405.  (3)  There was no
pretense of any notice to or knowledge by defendant that
the particular steer in question was vicious.  The only
contention and the only evidence offered by plaintiff was
to the effect that it is a matter of common knowledge
and general notoriety that Texas cattle as a class are
vicious and dangerous to handle, and that that was their
general reputation.  It was not necessary to prove that,
if it was a fact.  Whether proved or not, every one is
presumed to know that which is a matter of general
knowledge.  If it was a matter of general knowledge the
plaintiff is as much presumed to know it as the defend-
ant is, and he can not recover because he did know it.
On the other hand, if it is not a matter of general knowl-
edge, then there was no proof that defendant knew it,
and plaintiff can not recover because the defendant did
not know that the particular animal was vicious.  Earl
v. Van Alstine, 8 Barb. 630; Spring Co. v. Edgar, 99
U. S. 645; Decker v. Gammon, 44 Me. 322; Grimes v.
Eddy, 126 Mo. 168; 2 Wharton on Evidence, sec. 1295,
note; Buswell on Per. Injuries, sec. 127; Barnum v.
Terpenning, 75 Mich. 557; s. c., 42 N. W. 967; Smiley
v. Dollar Store, 47 Mo. App. 402; State v. Hayes, 78
Mo. 318; Shea v. Railroad, 76 Mo. App. 31; 2 Shearman
& Redfield on Negligence, secs. 629 and 690; Muller v.
McKesson, 73 N. Y. 199; Wharton on Law of Negli-
gence, secs. 907 and 909; Cooley on Torts, p. 342; Mayor
v. Young, 12 Bush (Ky.) 337; Watson v. Coal Co., 52
Mo. App. 366; Walsh v. Railroad, 27 Minn. 367 (8 N.
W. 145); Lucy v. Hannibal Oil Co., 129 Mo. 32.  Plain-
tiff will not be heard to say that he did not know a fact
which everyone is presumed by the law to know.  Nugent
v. Milling Co., 131 Mo. 252.  It does not add anything to
the defendant's knowledge that it was a carrier of the
steer in question.  A carrier is not bound to inquire or
inform himself of the nature or vices of articles deliv-
ered for transportation.  Parrott v. Wells, 15 Wall.
524.  (4)  The plaintiff wholly failed to overcome the

presumptions which the law makes against him, viz.: first, that the master, the defendant, discharged its full duty to him; and second, that he assumed the risk—or in other words, that the means of knowledge of the danger were not within his reach. Authorities cited under point 2; Wood's Law of Master and Servant, secs. 368 and 382; Agan v. Shannon, 103 Mo. 661; State ex rel. v. Bank, 120 Mo. 161; Lenox v. Harrison, 88 Mo. 491; Mathias v. O'Neill, 94 Mo. 520; Jewett v. Railroad, 50 Mo. App. 547; Bluedorn v. Railroad, 108 Mo. 448; Stepp v. Railroad, 85 Mo. 229; Petty v. Railroad, 88 Mo. 306; Schlereth v. Railroad, 96 Mo. 509; Chouteau v. Railroad, 122 Mo. 375; 1 Shearman & Redfield on Negligence, sec. 203; Epperson v. Postal Tel. Co., 50 S. W. 795; Bailey on Master and Servant, pp. 158 to 160, and pp. 112, and note, and 113, and pp. 155 to 163; Fugler v. Bothe, 117 Mo. 500; Watson v. Coal Co., 52 Mo. App. 366; Pratt v. Prouty, 26 N. E. 1002; Smith v. Car Works, 27 N. W. 662; Lyttle v. Railroad, 47 N. W. 573; Foley v. Railroad, 48 Mich. 622; Claybaugh v. Railroad, 56 Mo. App. 630; Alcorn v. Railroad, 108 Mo. 81; Bering v. Medart, 56 Mo. App. 443; Renfro v. Railroad, 86 Mo. 309; Rasmussan v. Railroad, 21 N. W. 583; Morse v. Railroad, 16 N. W. 358; Bryant v. Railroad, 29 N. W. 679; Derr v. Railroad, 27 Atl. 1002; Naylor v. Railroad, 53 Wis. 661; Howland v. Railroad, 54 Wis. 226; Longstad v. Railroad, 41 N. W. 755; Reed v. Stockmeyer, 74 Fed. 186. (5) Neither the alleged negligence, viz., that defendant "carelessly and' wrongfully ordered and directed plaintiff to drive said Texas steer into the pens of defendant," nor the negligence suggested by plaintiff's evidence and instructions, viz., that defendant failed to notify plaintiff of the dangerous character of the steer, was the proximate cause of plaintiff's injury. 1 Sedgwick on Damages, sec. 122; 8 Am. and Eng. Ency. of Law (2 Ed.), 601; 1 Shearman & Redfield on Negligence (5 Ed.), chap. 2; Hudson v. Railroad, 101 Mo. 34; Buswell on Personal Injuries (2 Ed.), p. 155; Brink

v. Railroad, 17 Mo. App. 199; Banks v. Railroad, 40 Mo. App. 464; Henry v. Railroad, 76 Mo. 293; Sira v. Railroad, 115 Mo. 127; Clemmons v. Railroad, 53 Mo. 366; Brown v. Railroad, 20 Mo. App. 227; Christy v. Hughes, 24 Mo. App. 277; Hicks v. Railroad, 46 Mo. App. 309.

*Rosenberger & Son, J. D. Barnett* and *H. W. Johnson* for respondent.

(1) Plaintiff has made out a case when he has established negligence on the part of the defendant, due care on his part and injury directly resulting from defendant's negligence. All of these matters are issues of fact, are supported by sufficient evidence, and, having been fairly submitted to the jury, will not be disturbed by this court. (2) Defendant by reason of its business, and as shown by its own admission, had due knowledge of the fact that Texas cattle as a class are vicious and dangerous, and that, as a result of injury or excitement, they are liable to become excitable and more wild, vicious and dangerous than ordinarily. This fact was known to defendant. It was not known to plaintiff, and it was not shown by any evidence in the case to be a matter of common knowledge or general notoriety. (3) Defendant is bound by the knowledge which it had that Texas cattle, excited as the result of a wreck, are dangerous and vicious animals. There is no presumption that plaintiff had any such knowledge. Texas cattle have no general reputation in the State of Missouri. The evidence negatives the fact of any general reputation. (4) Defendant having knowledge of the peculiar conditions surrounding the particular animal when it escaped from the wreck, and having knowledge that as a result of the wreck it was especially liable to be wild and ferocious, had knowledge which was not communicated to plaintiff, and which should have been communicated to him, had there been a due regard for plaintiff's

safety. (5) The immediate cause of plaintiff's injury was the attack of the steer. The promoting or first cause was the possession of full knowledge and information of the risk and danger incident to the service respondent was directed to perform, and the failure, neglect and omission of appellant to caution or warn him of such risk and danger at or prior to the time he was directed to perform the service. Barry v. Railroad, 98 Mo. 70; Wilkins v. Railroad, 101 Mo. 106. (6) Plaintiff had absolutely no knowledge or information of the danger or risk of the service he was directed to perform, while defendant was fully possessed of such knowledge or information, and failed, neglected and omitted to communicate same to plaintiff or utter a single word of caution or warning. Upon these facts the case was properly submitted to the jury and the finding was responsive to the law and the facts. Doyle v. Railroad, 140 Mo. 1. (7) When plaintiff found himself suddenly exposed to great danger, he was only required to do what he thought was best for his safety. This he did, and in doing so is not to be charged with negligence. Adams v. Railroad, 74 Mo. 560; Segrist v. Arnot, 86 Mo. 208. (8) Plaintiff is not to be charged with negligence because when exposed to sudden and immediate danger he did not adopt the safest and best course to avoid injury. It is sufficient if he adopted the means he thought best for his safety. Dickerson v. Railroad, 124 Mo. 140; Adams v. Railroad, supra; Segrist v. Arnot, supra. (9) The servant has a right to presume that the master will not send him into a dangerous place or to perform a service attended with unusual risk or danger without apprising him of the risk or danger incident to the service. Doyle v. Railroad, supra. (10) The question is, did plaintiff know, or ought he to have known, in the exercise of ordinary common sense and prudence, that the service was dangerous or attended with great risk? Cook v. Railroad, 34 Minn. 45; Sullivan v. Railroad, 107 Mo. 66; Doyle v. Railroad, supra.

MARSHALL, J.—This is an action for personal injuries. The plaintiff recovered twenty-five hundred dollars damages, in the circuit court, and the defendant appealed to the St. Louis Court of Appeals, where the judgment was affirmed, but as one of the judges of that court was of the opinion that the decision therein was in conflict with certain previous decisions of this court, and of the Courts of Appeals, the cause was certified to this court for determination, pursuant to section 6 of the amendment of 1884 to article 6 of the Constitution, and by that section it is made the duty of this court to rehear and determine the cause "as in case of jurisdiction obtained by ordinary appellate process."

The respondent has filed a motion to remand the cause to the St. Louis Court of Appeals, because he claims that an analysis of the cases with which the decision of the Court of Appeals in this case was deemed by said judge of said court to conflict, shows that no such conflict exists. But this motion must be overruled, because the jurisdiction of this court in such cases does not depend upon the fact that there is in reality any such conflict, but depends solely upon the fact that one of the judges of the Court of Appeals deemed such conflict to exist. This court may be fully satisfied that there is no such conflict, but it can not remand the case, because the Constitution makes it the duty of this court, in such cases to rehear and determine the cause as in case of jurisdiction obtained by ordinary appellate process.

The injury complained of was received near Marthasville, in Warren county, on May 10, 1897. The plaintiff was a section hand in the employ of the defendant. A freight train of the defendant was wrecked. One of the cars contained Texas steers. That car was broken open, the steers escaped, and the section gang, of which the plaintiff was a member, was summoned to the wreck. Some of the steers remained near the wreck, most of them went towards the east, and one went to-

wards the west. The section gang in charge of the part of the road where the accident occurred, was composed of Otto Housman, foreman, his two sons Jim and George, and the plaintiff. When the plaintiff reached the scene of the wreck, he and Jim Housman, were ordered to go with the station agent, Walker, and gather up the cattle, and put them in the cattle pens at Marthasville. They first put up those that remained near to the wreck, and then took horses, and went after those that had gone east, and found them and put them in the pens. Then the foreman told his two sons, Jim and George Housman, and the plaintiff that one of the steers had gone west, and directed them to go after it and drive it back to the pens. They obeyed the order and went. This preliminary statement is made to facilitate an understanding of the nature of the negligence charged against the defendant.

The negligence charged in the petition is this:

"That one steer known as a Texas steer was very wild and vicious and very dangerous to handle and by reason of having been in said wreck, and being bruised and otherwise injured, and greatly frightened and excited, its wild, vicious and dangerous character was greatly increased; that plaintiff had no experience in such work and was uninformed as to the danger attendant upon it, and was wholly ignorant of the dangerous, wild and vicious character of said steer, *or of the circumstances aforesaid, which had greatly increased the same;* that all of said facts were well known to the officers and servants of the defendant, under whose control this plaintiff was at the time, or by the exercise of ordinary diligence said facts might have been known to them. That, nevertheless, the said servants of the defendant, in charge of said work, negligently, carelessly and wrongfully ordered and directed plaintiff to drive said Texas steer into the pens of defendant at said station of Marthasville; that being so ordered and required to

do said work, *and being ignorant as aforesaid* of the danger attendant upon the same, and relying upon defendant, that it would protect plaintiff and not expose him to unnecessary danger, this plaintiff undertook to assist in said work; that while doing so and without any fault on plaintiff's part, this plaintiff was viciously attacked and set upon by said Texas steer, whereby plaintiff's life was greatly endangered, and that in attempting to escape from said animal and save his life, he fell over a steep and precipitous bank and was greatly injured,'' etc.

The answer admits the wreck, the escape of the cattle, the plaintiff's relation to it as section hand, and that after the wreck the plaintiff was engaged in clearing up the wreck and in looking after and caring for the cattle, and avers that such work was within the line of the plaintiff's ordinary duty as a section hand.

The answer then proceeds as follows:

''Defendant farther states that a large part of its business is the transportation of Texas cattle from Texas to points in Missouri, and elsewhere, and defendant admits that all Texas cattle are, by nature, wild and vicious and dangerous to handle, and that such qualities of Texas steers as a class, is a matter of general notoriety and of common knowledge among all persons.

''Farther answering, defendant says that there is always more or less risk and hazard connected with the duties of a section hand, and especially in and about the work necessary to be done in cases of wreck, and in the matter of collecting and restraining Texas cattle which may have escaped therefrom, all of which is, and at the time mentioned in the petition was, a matter of general notoriety, and of and concerning which, the opportunity to know was open to all persons alike.''

The answer then pleads assumption of risks, a general denial of all matters alleged and not admitted, and contributory negligence, in that, the plaintiff unnecessarily, carelessly and recklessly assaulted the aggra-

vated steer mentioned in the petition, and in like manner placed himself in front of and near the steer and refused to move when he could easily have done so and have averted the injury.

The reply denies all the allegations of the answer, not admitted, and then pleads specially that when he was directed to drive the steer into the pens, it was dark and not yet daylight, that he had not seen the steer, and was ignorant that he was a Texas steer or that he was dangerous and vicious and had been injured and was excited and made wild and dangerous by the wreck, but that the defendant well knew such facts; that when he was directed by the foreman to go after the steer he obeyed without any knowledge that the duty required was attended by any danger, and that immediately upon discovering the steer it charged upon the plaintiff and he had no opportunity to escape; that he made no attack upon the steer but only attempted to ward off the attack of the steer upon him, and that the animal's attack upon him was instantaneous upon plaintiff's discovery of the animal and the flight of the plaintiff.

In addition to the facts set out in the preliminary statement, supra, the trial developed the facts to be as follows:

When Jim and George Housman and the plaintiff started on foot, west along the railroad track, to look for the steer that had gone in that direction, the plaintiff armed himself with a club, concerning which the plaintiff testified as follows:

"Q. What did you take the club for? A. I very often take a club if I am after stock.

"Q. How big was the stick? A. A good big one.

"Q. Tell the jury how big it was? A. I suppose as big as my arm and may be bigger.

"Q. How long was it? A. Six or seven feet.

"Q. You got that when you started from Marthasville? A. Yes, sir.

"Q. And carried it all the way up there? A. Yes, sir.

"Q. And carried it to defend yourself against that steer? A. If I needed it.

"Q. You thought you might need it? A. I didn't know.

"Q. There was a danger that you might need it and you prepared yourself for the danger that might overtake you? A. I prepared myself that far, yes, sir."

Jim and George Housman and the plaintiff went west along the railroad track for about two miles and there discovered the steer in a field, about two hundred yards from the track. They went into the field after him, and the plaintiff says the steer "acted wild," and ran out of the field onto the railroad track, and thence eastwardly towards Marthasville. They followed. Jim was in front, then came George, and lastly the plaintiff. The evidence varies as to the distances between the three. It was about six o'clock in the morning and was quite foggy. The plaintiff says they had gone on the track "about two telegraph poles," when Jim, who was leading, cried out, "There he comes," and jumped off onto the north side of the track. The plaintiff says he heard this warning from Jim, and saw him jump, but he did not hear any warning from George, who was closer to the plaintiff than was Jim, but he says he saw George also jump off of the track. George says he also warned the plaintiff that the steer was coming. The plaintiff says that when he first saw the steer, he was twenty-five or thirty feet from him and was coming at him "with his head tucked down as hard as he could come;" that he started to the north side of the track and the steer also started in that direction, and that he then started towards the south side of the track, and as the steer started also toward the south side of the track, he struck the steer with the club he was carrying, and the steer veered off towards to the north and passed by

him and he ran down the side of the railroad embankment and jumped into the borrow pit that was near the bottom of the embankment, and which was muddy, and that his feet stuck in the mud and he injured his knee.

There is no substantial difference between the testimony of the plaintiff and that of Jim and George Housman as to what occurred at the time of the accident, except that George says he also warned the plaintiff of the approach of the steer and the plaintiff says he did not hear George's warning, and except as to the distances between the three at the time the steer came back towards the west, and these differences are not material or controlling in this case.

At the place where the accident occurred the track was on an embankment about fifteen feet high. The embankment was about twenty feet wider at the bottom than it was at the top. At the bottom of the embankment there was a level strip of land about twelve or fifteen feet wide, and beyond that there was quite a large borrow pit, that is, a place from which earth had been taken to make the embankment, which was about two feet deep. The side of the borrow pit towards the track was sloped, so as to enable the scrapers to haul the earth out of the pit and place it on the embankment. The bottom of the pit was muddy. The plaintiff says that when he ran down the embankment it was so steep that his body gained so great a momentum that he could not stop on the level ground at the bottom, nor could he change his course, and that he, therefore, jumped some six or seven feet out into the borrow pit, and his feet stuck in the mud and he was injured.

Jim Housman said that when he ran down the embankment, it was so steep that he could not stop on the level at the bottom and that he, too, ran into the borrow pit and went into the mud up to his ankles, and that threw him down face foremost in the mud. He also says that when the plaintiff hit the steer with the club the steer went past the plaintiff and went on towards the

west, and that the plaintiff then turned and ran down the embankment.

Touching the steers, the plaintiff testified that they were all quiet except the one that went west, and he "acted wild" and ran from them when they found him in the field. This is the only evidence there is in the case to support the allegation of the petition that this particular animal was wild and vicious and dangerous to handle and by reason of the wreck such condition was greatly increased.

The foreman, Otto Housman, testified that the conductor of the train came to his house and waked him up. He was asked: "Q. Did he tell you anything about the steers? A. Yes, sir, he told me when I got to the tool house, and the men was there, he says, 'You must look out, there's a lot of Texas steers out here;' he says, 'They might get after you or hurt you some way, be careful.'"

Touching the warning given to the plaintiff, the foreman testified on direct examination: "Q. Tell the jury what you told Mr. Clark and your sons when you told them to go west? A. I told them to go on up after that steer and get him if they could, and as they went off I told them to be very careful and see that he didn't hurt them or get hurt; I told them to look out for him, that was the same as to warn them to be careful, that they might get hurt." On cross-examination he was asked: "Q. Now you say you said something to them about being careful? A. Yes, sir, when they started off, they were some little distance and I happened to think about speaking and I said be careful. I don't know whether they heard me, I spoke to them; I guess they were as far as to the back seat of the house here, and I spoke out pretty loud, but I don't know whether they heard me. Q. What did you say? A. I said to be careful about that steer, he might hurt you? Q. But you don't know whether they heard you? A. I don't

know whether they heard me, they never made any halt or turned back or anything and I kept on with my work."

The plaintiff in rebuttal said the foreman said nothing except to get the steer. Jim Housman was not asked about the matter but George Housman was, and he said he did not hear the said warning.

George Housman testified that his father sent him to wake the plaintiff and that he did so. He then testified as follows:

"Q. What did you do and what did you see of the plaintiff when you woke him? A. I got up and fixed my lantern and started out and the boss told me there was a carload of Texas cattle wrecked, I would have to watch out, and told me to tell the rest of the men when I told them, and I did so.

"Q. Did you tell that warning to Mr. Clark? A. Yes, sir.

"Q. Where and when? A. Right at the door.

"Q. What door? A. In his house and he wanted me to wait and go with him and I told him no, I had to go and wake some of the other men, the other gang.

"Q. That is the gang east? A. Yes, sir."

Touching the plaintiff's knowledge of the character of this particular steer, Jim Housman testified that as he and the plaintiff were going west on the track in search of the steer, they met two little girls, going east towards the German school, and further said:

"Q. What occurred when you met them? A. As we met them I told them to be careful. They were Germans and couldn't understand Americans very well, and I told them, and they didn't quite understand me and Mr. Clark told them the same thing and they answered and went on.

"Q. What did he tell them?' A. He told them to be careful and watch out, there was a mad or wild steer, something of that kind, and he might run over them and hurt them or something."

In rebuttal the plaintiff said he did not remember this conversation with the little girls, and also said Jim Housman did not warn him about the steers nor did any one else.

Touching the plaintiff's knowledge of Texas steers as a class, the plaintiff testified that he had heard of Texas cattle, and he knew that the defendant carried a great many on its road, but that he had never heard that as a class they are dangerous and vicious. He was then asked:

"Q. On the former trial, when you testified, didn't I ask you this question about Texas cattle? 'You knew as a rule they are a vicious sort of animal?' 'It seems that way.' 'I am speaking of what you know personally?' 'I heard it was so.' Did you answer that way before? A. Probably I did."

On re-direct examination the plaintiff testified as follows:

"Q. Mr. Clark, I don't know whether I asked you, what, if anything, you had ever heard before this wreck as to the character of Texas steers? A. I never heard nothing about them until afterwards, I heard a good deal about them afterwards.

"Q. I will get you to state to the jury if you knew anything of the characteristics of these cattle? A. No, sir, I never was about them.

"Q. State whether you knew anything of their vicious habits? A. No, sir, I knew nothing about them at all.

"Q. Had you ever heard it discussed in the neighborhood? A. No, sir."

On re-cross-examination the plaintiff testified as follows:

"Q. Now, on the former trial I want to ask you in that connection, if you wasn't asked the question and didn't answer it in this way, with reference to what you had heard before this: 'Had you ever heard of Texas cattle before that day?' 'Yes, sir, often heard of them.'

'Heard people talk about them?' 'Yes, sir.' Did you state that? A. Don't remember.''

With respect to the character of Texas steers as a class, the plaintiff read in evidence the first and second amended answers of the defendant. The several answers differ only in this respect, that the prior answers after the words, "And it admits that Texas cattle are, by nature, wild, vicious and dangerous to handle," contained the additional words, "And that when confined in cars, or when surrounded by conditions liable to produce excitement, as by the wreck of a train, they are liable to become excited and more wild and vicious and more dangerous than ordinary." All the answers then proceed with the words, "That such qualities of Texas steers is a matter of general notoriety." The prior answers followed this averment with the words, "Especially among men employed upon railroads and engaged in the transportation of such animals," while the last answer followed said averment with the words, "And of common knowledge among all persons."

Bearing upon the question as to whether it was within the line of the plaintiff's duty to go after the cattle, the plaintiff testified as follows:

"Q. You had been working at that time about four years on the section? A. Yes, sir.

"Q. When other wrecks had occurred on the road there on that section or other sections, you with the other section men, had been called on to come and help clear them up? A. Yes, sir.

"Q. It is a part of the duty of the section men to help take care of wrecks? A. Yes, sir.

"Q. And look after the freight and property of the train? A. I don't know anything about the property; I never was in a cattle wreck; I was in a wreck where some hogs was once, and we taken care of them.

"Q. They sent you after them? A. Yes, sir.

"Q. When you testified before, didn't you say it

was a part of the duty of the section men to help get up the wreck and take care of the property on the wrecked trains? A. I said it was a section hand's duty to take care of the wrecks, yes, sir.

"Q. And look after the property? A. Well, we never had anything of that sort to do, only one time; only handling freight.

"Q. There were no other men employed by the company to do that sort of work, only the section men? A. Not that I know of.

"Q. When the hogs were out they sent you and you did it? A. Yes, sir.

"Q. And when the cattle got out and they sent for you, you did it? A. No.

"Q. Was it or not a part of your duty? A. It ought not to be.

"Q. May be a great many things ought not to be that way; was it a part of your duty? A. I don't think it ought to be; I don't know whether it was or not.

"Q. You knew the railroad company depended upon you as one of the section men to help do that? A. I didn't know they depended on me to hunt up Texas cattle.

"Q. Was it outside of your duty? A. Yes, sir, I believe it was.

"Q. Why did you do it? A. Because the foreman notified me.

"Q. Was it his duty to notify you of something you ought not to do? A. I don't know.

"Q. Was it part of his duty or not to order you to get the cattle? A. I suppose he thought so.

"Q. What did you think at the time? (Objection.)

"Q. If you thought it wasn't your duty why did you do? (Objection.)

"Court. He can say why he did so and so.

"A. When you work on the track you either have to go or quit when you are notified.

"Q. He is the one to determine what you do? A. Yes, sir.

"Q. If he sends you out there it is a part of your duty to go? A. You have to go or quit.

"Q. That makes it a part of your duty? A. I reckon, if he says so."

At the close of the plaintiff's case and again at the close of the whole case, the defendant interposed a demurrer to the evidence, which was overruled and exception saved. Various instructions were given and refused, and, as stated, after a verdict for the plaintiff, the defendant appealed.

## I.

At the threshold of this case the crucial question is presented whether the petition states a cause of action, and if so whether the evidence makes a case for the jury.

In the first place, the plaintiff was in the employ of the defendant as a section hand. There was a wreck, including a car loaded with Texas steers. The steers escaped from the car, and scattered. Conceding it was within the line of duty of a section hand to clear away the wreck, and in the doing of it, to gather up and care for freight, the plaintiff admits that on the occasion of a prior wreck of a train containing a carload of hogs which escaped, as a part of his duty he assisted in gathering them up and putting them in pens, and he also admits that he knew of no one else connected with the road, whose duty it was to collect and pen up the Texas steers, but he expresses the opinion that it was outside of his duty to do so, and that he did it on this occasion only because the foreman ordered him to do it, and says he supposes the foreman thought it was a part of the plaintiff's duty, and that he obeyed the order, because in railroad work, one must obey the orders of the foreman or quit.

Therefore, it was either within the line of the plaintiff's duty and the foreman had a right to give the order, and the plaintiff can not recover, because it was a risk incident to the service, or else, it was not within the line of the plaintiff's duty, and the foreman had no right to demand the service, and no right to bind the principal for damages received by the servant in consequence of acts required by the foreman which he had no right to require.

And it will not help the case to say that it was a new employment by the foreman for a new service entirely outside of and different from his employment as a section hand. For if it was such a new service and the servant voluntarily entered upon it, he assumed the risks ordinarily incident to such service.

The learned counsel for the plaintiff evidently realized this, for they endeavored to avoid these difficulties when they drew the petition. The petition is based upon the idea that it is ordinarily within the line of duty of a section hand to assist in gathering up even Texas steers, that have escaped from a wrecked car, but that the defendant is liable in this case for the reason that it ordered him to go after and pen up this particular steer which was wild and vicious and very dangerous to handle, and greatly frightened and excited by reason of having been in the wreck, all of which was known to the defendant or could have been known to it by the exercise of ordinary care, and which was wholly unknown to the plaintiff, and that the plaintiff relied upon it that the defendant would not expose him to unnecessary danger.

It will be observed that the petition does not in express terms charge the defendant with negligence in failing to warn the plaintiff of an unusual or extraordinary risk or peril arising out of the service, of which the defendant was aware and the plaintiff was ignorant, but this must have been the intention of the pleader, for without this, the petition states no cause of action what-

ever.   And the case was tried below on the theory that this was the proper construction to put upon the petition and it was not attacked in any way, but both sides introduced evidence upon this theory, without objection from the other.   The case will therefore be so treated here.

The first postulate, therefore, is, that ordinarily it is within the line of duty of a section hand to assist in clearing away a wreck and in gathering up the freight and if the freight happens to be Texas steers, to gather them up and put them in pens.

This resolves this case into the narrow question whether the defendant is liable to this plaintiff, because it knew this particular steer was wild, vicious and dangerous, and greatly frightened and excited by reason of the wreck, and the plaintiff was ignorant thereof, and that the defendant failed to warn the plaintiff of such facts when it sent him after the steer, and that such failure of the defendant to warn the plaintiff was the direct and proximate cause of the injury.

This, of course, assumes that it was within the line of the plaintiff's duty to go after the steer, even though it was wild, vicious and hard to handle, and that the sole negligence of the defendant was a failure to notify the plaintiff of the character of this particular steer.

Counsel for the defendant has furnished the court with an exhaustive treatise, replete with citations of cases, upon the liability of a person for injuries inflicted upon others by animals, *ferae naturae,* which he has in his possession, and by domestic animals.   The general rule deducible from the authorities being that every one is charged with notice of the nature and propensity to inflict injury, of animals *ferae naturae,* and, therefore, if one keeps such animals in his possession he is liable for damages done by them, without express proof of knowledge of the nature of the animal, but that as to domestic animals, a *scienter* must be alleged and proven.

The chief difference between counsel in this case is the application of the general principles of law to the concrete case in hand.

The primary disagreement is as to whether Texas steers are *ferae . naturae* or domestic animals. The plaintiff contends that the defendant's prior answers in this case admitted that "Texas cattle are by nature wild and vicious and dangerous to handle, and that when confined in cars, or when surrounded by conditions liable to produce excitement, as by the wreck of a train, they are liable to become excited and more wild and vicious, and more dangerous than ordinary; that such qualities of Texas steers is a matter of general notoriety, especially among men employed upon railroads and engaged in the transportation of such animals," and that the defendant, therefore, is liable in this case, because it had in its possession such animals, and that as the defendant admits that all Texas steers are wild, vicious and dangerous to handle, it was not necessary for the plaintiff to show that the defendant knew that this particular steer was wild, vicious and dangerous. But while so contending as to the defendant, the plaintiff says he can not be charged with notice of the character of Texas steers as a class nor as to the character of this particular steer. Or, otherwise stated, the plaintiff's position is, that the defendant is bound by the admissions of its abandoned answer, and that the plaintiff can introduce them against the defendant so as to bind it, but that the plaintiff is not bound or affected by such admissions. That is, that one party litigant can use such parts of a pleading filed by his adversary as affects his adversary injuriously and benefits the party so introducing such admission, but that such party can reject such other parts of his adversary's pleadings as makes in favor of his adversary and against himself. In other words, that he can split up his adversary's pleading and use dismembered parts thereof as an admission

against him, and discard such parts as affect injuriously the party so introducing it.

This is a misapprehension. An admission of one's adversary must be taken as a whole. The good must go with the bad. One who seeks to use an admission of his adversary, must take the admission *cum onere.*

Viewed in this light the answers of the defendant tend to show that Texas cattle as a class are *ferae naturae,* and vicious, dangerous to handle and liable to inflict injury, and as the whole includes the sum of all its parts, so this particular steer, being one of such class, was vicious and dangerous, and, therefore, it was not necessary for the plaintiff to prove the character of this particular steer, for the defendant had admitted that it knew such character already.

But while this is true, it does not make out a case for the plaintiff, for the reason that the admission says that "such qualities of Texas steers is a matter of general notoriety, especially among men employed upon railroads and engaged in the transportation of such animals," and the plaintiff was employed upon railroads, and therefore he knew, both from that fact and because all men know those things that are matters of general notoriety, that all Texas steers, this particular steer included, are vicious and dangerous to handle. Hence, both the plaintiff and the defendant, according to this hypothesis, were equally informed of the character of this particular steer, and the defendant can not be held liable for a failure to give the plaintiff a warning as to such fact, for plaintiff already knew it.

It is manifest, therefore, that upon this theory the plaintiff is not entitled to recover, and counsel for plaintiff practically concede this when they take the position that they are entitled to split up the admission, and use only such parts as affect the defendant injuriously, and not be bound by such parts as affect the plaintiff injuriously.

The plaintiff, however, does not take the position

that Texas cattle as a class are wild, vicious and dangerous to handle. The petition evidently implies the converse to be true, and attempts to take the particular steer out of the general class, and to hold the defendant liable because this particular steer was of that character, which the defendant knew, and the plaintiff did not, and the defendant failed to warn the plaintiff of that fact.

It is true the plaintiff admitted in one breath that he had testified on the former trial of this case, that he had heard that all Texas steers are vicious and dangerous, and in the next breath said he did not remember whether he had so testified or not; and that upon this trial he said he had never heard or known anything about such cattle before the accident. It is also true that the plaintiff called witnesses to testify as to the character of Texas steers, one of whom said they are, as a class, vicious and dangerous, and the others said they are generally quiet and inoffensive unless they are attacked or become unusually excited.

It is also true that the plaintiff testified that he found all of the other steers that were in this wreck, quiet and easy to handle, and that when they came upon this particular steer he "acted wild," and ran away from them, and that he first went east upon the railroad track and when they were following him, he turned and came west again and that when he saw him he was coming towards him "with his head tucked down as hard as he could come;" and that he continued to come, notwithstanding the usual cries to cattle that were employed by Jim Housman, and notwithstanding the plaintiff stood in his way with a big club in his hand.

It is also true that the plaintiff denied that he heard the warning given to them by the foreman when they started after this steer, and also denied that George Housman warned him as to all the steers (not this one in particular) when he woke him, and cautioned him that they might hurt him.

But even if all this be accepted as true in this case, it still is not sufficient to make the defendant liable. The plaintiff's right to recover under the pleadings, as hereinbefore construed, and under the evidence adduced, depends upon the predicates that the defendant knew that this particular steer was vicious and dangerous and that the plaintiff was ignorant of it, and that the defendant was negligent in not warning the plaintiff of that fact, and that such fact and failure were the direct and proximate cause of the injury.

The record is absolutely destitute of any evidence that either the defendant or the foreman had any knowledge whatever that this particular steer was in any respect different from any of the others, and the plaintiff himself says the others were quiet.

The evidence shows that the only information that the foreman had was, that the conductor told him, when he got down to the tool house, that there were a lot of Texas steers out, and warned him to be careful, as they might get after him and hurt him. But this related to all the steers as a class and not to this particular steer. So that this would be insufficient to support the allegations of the petition that this steer was different from the Texas steers as a class.

Aside from this, the foreman who testified as to this warning of the conductor, said in the same answer, that "the men were there." "The men" could only refer to the section gang, that was composed of the plaintiff and the two sons of the foreman.

This is the sum of all the testimony there is in the record of any attempt to charge the defendant with knowledge of the character of this particular steer, and the testimony was not a part of the plaintiff's case in chief, but was brought out in the cross-examination of the defendant's witnesses, and was not before the court when the court overruled the demurrer to the evidence at the close of the plaintiff's case. In fact, up to that time there had been no attempt whatever to prove that

the defendant had any knowledge as to this particular steer, but the plaintiff had relied upon the admission in the defendant's abandoned answers, which have been been above analyzed and discussed and found insuffic- ient to make out a case.

So that the record discloses the fact to be that the plaintiff wholly failed to prove in chief that the defend- ant knew that this particular steer was different from any of the others, or that he was vicious or dangerous, and that the plaintiff was ignorant of that fact, and that the defendant was negligent in failing to warn the plain- tiff of that fact, and that such failure was the direct and proximate cause of the injury, and the defendant's evi- dence did not help out the plaintiff's case.

On the contrary, it not only appears from the physical facts adduced by the plaintiff in his case in chief that the plaintiff knew or believed that all Texas steers are vicious and dangerous, and that before the moment when the plaintiff was placed in any peril by this steer, he knew he had "acted wild" when they had previously found him in the field. For upon no other hypothesis can the fact be accounted for that when he started after this particular steer he armed himself with a club as big as his arm and six or seven feet long.

Aside from all this, however, the plaintiff knew more about this particular steer than the defendant or the foreman did, for a sufficient length of time before he was placed in peril to be as much upon his guard as he could possibly have been if he had had warning.

For the plaintiff himself testified that when they found this steer in the field he "acted wild." Now, wild animals are dangerous, and domestic animals may be- come dangerous when so excited as to "act wild." But whether or not an animal that does "act wild" is vici- ous and dangerous, the very fact that it does "act wild" is sufficient to put a man of ordinary prudence upon his guard and cause him to take all available means to prevent being injured by such animal.

The fact, therefore, is undisputed that the plaintiff armed himself with a big club when he was sent after this steer, and that he found out that the steer "acted wild." The fact is also undisputed that Jim Housman was in the lead, next came George Housman, and the plaintiff came last, and that they were on the railroad track, which at that place was on the top of a fifteen-foot embankment, which was so steep that when one ran down it the momentum of the body carried the person over the level space at the foot of the embankment and into the borrow pit.

These were the positions of the parties and the condition of the *locus in quo,* at the time of the accident. Jim Housman cried out, "Here he comes;" halloed to the steer as men usually do when driving cattle; the steer kept coming towards him, and Jim jumped off the track and ran down the embankment into the borrow pit, and his feet stuck in the mud and he fell on his face. George Housman also jumped off the track and ran down the embankment, but it does not appear whether he, too, was precipitated into the borrow pit. George also gave the warning of the approach of the steer. The plaintiff says that he heard Jim's warning, but did not hear George's.

Assume that this is true. The fact is that after Jim gave the warning George had time to jump off the track and out of danger before the steer reached him. George was nearer to Jim and to the steer than the plaintiff was. Yet the plaintiff says he did not have time to get out of the way before the steer came upon him. This is a manifest error, for George was nearer to the steer than he was, and George had time to get out of the way, and, therefore, it must have been that the plaintiff had time to do so.

But instead of doing so, the plaintiff stood still on the track until the steer came upon him. Then he moved towards the north side of the track, and the steer moved in the same direction. He then moved towards the south side of the track, and when the steer tried to come over

to that side also, he struck him, or struck at him, with the big club, and the steer veered towards the north side of the track, passed the plaintiff and went on towards the west, and the plaintiff ran down the embankment, jumped into the borrow pit, got stuck in the mud, and hurt his leg.

It is too plain to admit of serious discussion upon such a state of facts as this, that the plaintiff had more knowledge than the defendant had as to the character of this particular steer at the time he was placed in peril, and also that the plaintiff had as much notice or warning to look out for danger as if the defendant had known of the character of this particular steer and had warned the plaintiff thereof before he started after him. It is also beyond doubt that if the plaintiff had been so warned it would have made no difference in this case. Because with the precautions the plaintiff had taken to protect himself against this steer, and with his knowledge that this steer had "acted wild," and with Jim's warning cry, and with the knowledge that both Jim and George had jumped out of the way of the steer, the plaintiff failed to do as they had done and seek a place of safety, but stood still until the steer came upon him. And even after all this, the plaintiff drove the steer away from him, and did not run down the embankment until after the steer had passed beyond him, and all danger from the steer was gone.

It is quite true that the conduct of persons in the face of imminent peril is not to be judged as strictly or as harshly as it would be if no such danger was impending. But the thought here present is that at the moment when the plaintiff was placed in peril, he knew as much as he could have known if the defendant had known and warned him of the character of this steer, and that his conduct was not different from what it would, in all human probability, have been if he had been so warned. It is also manifest that the failure of the defendant to give such a warning was not the direct or proximate

cause of the injury, but that the injury was the result of the plaintiff's own conduct in not getting off the track and out of the way of the steer, as Jim and George did, or of the plaintiff's unnecessarily running down the embankment after the danger was passed.

Aside from all this, however, if the embankment was so steep that when one ran down it the momentum of the body became so great that he could not stop on the level at the bottom and was necessarily precipitated into the borrow pit, then it is not perceivable what bearing the failure to give notice or warning would have in this case. For if with warning the only thing one could do was to run down the embankment, and if running down the embankment necessarily produced such results, then the same result would ensue if one ran down the embankment in consequence of or without such warning, and therefore the failure to give such warning could not be the direct and proximate cause of the injury.

This is illustrated by the experience of Jim Housman. He says he had warning that there were some Texas steers out, and that he must be careful or he might get hurt. He had no warning as to this particular steer, because neither the defendant nor the foreman knew anything about this particular steer. With this warning in mind, when the steer came upon him on the railroad track on the top of the embankment, he did the only thing he could do—he was not armed with a club as the plaintiff was—he ran down the embankment, and the momentum was so great that he could not stop at the bottom, but he was precipitated into the borrow pit, he went into the mud up to his ankles, and he was thrown on his face. Thus he did with notice exactly what the plaintiff says he did without notice. They both went into the borrow pit, and got stuck in the mud. The only difference between them was that one was hurt and the other was not.

So that it conclusively appears that the result to the

plaintiff would have been exactly the same whether he had notice or not, and in addition to this that the defendant and the foreman knew nothing about this particular steer, but that at the time of the accident the plaintiff knew more about this steer than they did. The plaintiff's right to recover is made by the petition and the theory adopted by the parties for the trial of the case to depend upon the knowledge of the defendant and the ignorance of the plaintiff of the character of this particular steer and the negligence of the defendant to give the plaintiff proper warning thereof, and upon the failure to give such warning being the direct and proximate cause of the injury, and the case made by the plaintiff or taken as a whole, fails to make out a case, and, therefore, the trial court should have sustained the demurrer to the evidence, and have directed a verdict for the defendant.

The plaintiff contends, however, that the nature of the defendant's business is such that it knows or has the opportunity to know or could by the exercise of ordinary care have known the character of Texas steers.

Even if this was true of such steers as a class, it would not be true as to any particular steer. But it is not true that a common carrier is charged with notice of the character of the freight it transports. That contention was set at rest by the decision of the Supreme Court of the United States in the nitroglycerine case, Parrot v. Wells, Fargo & Co., 15 Wall. 524.

This conclusion makes it unnecessary to consider the other errors assigned.

The judgment of the circuit court is reversed, and as the ends of justice would not be subserved by ordering a new trial, the cause is not remanded. All concur.