**Wallace W. HUMES, Respondent,**

v.

**Dr. Carmen N. SALERNO, Appellant.**

**No. 48510.**

Supreme Court of Missouri,

Division No. 2.

Nov. 13, 1961.

Motion for Rehearing or to Transfer to Court en Banc Denied Dec. 11, 1961.

Carter, Fitzsimmons & Brinker, Lee M. Carter, Clayton, for appellant.

Hal B. Coleman, Coleman, Ross & Cekovsky, Clayton, William L. Mason, Jr., St. Louis, for respondent.

BARRETT, Commissioner.

The plaintiff, "Wally" Humes, is a professional free-lance jockey and the defendant, Dr. Carmen N. Salerno, is an owner of race horses. In March 1959, Dr. Salerno employed Wally on a part-time, after-hours basis to "pony" three of his race horses at his farm on Charbonnier Road, preparatory to the races at Cahokia. In the language of the race track to "pony" a horse means that a jockey rides a saddled "stock" horse and leads or controls the haltered race horse with a halter shank, a single rein attached to a chain, the chain in the horse's mouth, across its nose or under its chin. The jockey controls the race horse by holding the rein near the chain with the horse's head close to the jockey's hip and always back of the pony horse's head. In this manner the jockey walks the race horse around the track, then jogs it around and finally gallops the horse five or six times around the track.

On March 23 Wally appeared at Dr. Salerno's farm and "poneyed" the horse Lisa's Lad, then the groom handed him the stallion, Sal's Son, with the halter shank chain through his mouth. Wally was not familiar with this horse, had no prior experience with him and was given no instruction or warning other than to gallop him around the track five or six times. He walked Sal's Son around the track once, jogged him around once and then successfully galloped him five and a half times around the track. At that point in the ponying, as they came into the final turn, Sal's Son suddenly "went into a rage" and "nailed" Wally's right leg between his teeth, the horses went off the track, the stock horse was knocked down and Sal's Son hung onto Wally's leg, stumbled and "still had me in his mouth, on the ground, and growling like a lion." To recover damages for his resulting injuries Wally instituted this suit on the theory that Dr. Salerno knowingly and without warning furnished him with a vicious and dangerous horse. Upon the trial of the cause a jury found the issues for Wally and fixed his damages at $32,000 and Dr. Salerno has appealed. The doctor's first and principal claim is that the trial court should have directed a verdict in his favor because there was insufficient evidence to support a finding that his racing stallion had an abnormal propensity to injure persons and that he had not manifested such propensity "prior to the accident as to impute knowledge of it to the defendant."

Race horses are spirited and tempermental, even unpredictable, stallions

more so than mares and geldings, but, Wally said, "It is just temperament like people." He also said that on this occasion the conduct of Sal's Son was unusual, in his seventeen years as a jockey he had not had a comparable experience. But in addition to the particular incident and Wally's description of it another jockey, Edgar Wallace, had exercised Sal's Son in 1956 and he said, "You had to watch him and have a figure 8 on him. He was real rough to gallop and he would try to bite you, for another thing. * * * He has tried to bite me while I was on his back and when I was off of him and holding him. * * * Sometimes he turns around and nips at your foot but he couldn't bite me because he had a figure 8 on him; he would have been able to if he hadn't, that is the reason we used that." Furthermore, Edgar said, "he would try to paw you with his foot, either one," and when galloping he had seen him try to "savage" (a horse-racing term meaning to bite or attack) another horse. It is not necessary at this point to search out other evidence, in these circumstances, as the jury could and did find them, Sal's Son was a vicious horse (Merritt v. Matchett, 135 Mo.App. 176, 115 S.W. 1066; Maxwell v. Fraze, Mo.App., 344 S.W.2d 262), and the only question is whether there is also evidence from which the jury could reasonably draw the inference that Dr. Salerno had actual or constructive knowledge of the fact. State ex rel. Kroger Co. v. Craig, Mo. App., 329 S.W.2d 804, 809; Clark v. Missouri, K. & T. Ry. Co., 179 Mo. 66, 77 S.W. 882; Alexander v. Crochett, 233 Mo. App. 674, 124 S.W.2d 534. In addition to these cases, other cases and the general rules are set forth and collected in Clinkenbeard v. Reinert, 284 Mo. 569, 225 S.W. 667, 13 A.L.R. 485; Rolleg v. Lofton, Mo. App., 230 S.W. 330; 3 C.J.S. Animals 148, p. 1248; 2 Am.Jur. Animals, Sec. 48, p. 728 and the annotations 15 A.L.R.2d 1313, 17 A.L.R.2d 459.

The jockey, Wallace, on cross-examination said that he had complained of Sal's Son's conduct, and, of the horse's trainer, Clark, he said, "He knew the horse was mean." Sal's Son had been under the care of a veterinary in December 1958 for a bowed tendon and a "bad case of thrush" and then or later had been placed on the "vet's list" which meant that he could not run on certain tracks. In any event, when Wally was admitted to the osteopathic hospital Dr. Salerno in his first conversation said, "He told me, 'Wally this should never have happened. If I had been out there, I would have never have let you take the horse out there. You should have had a figure 8 or a nose band on.'" The doctor said the same thing to Wally's wife and brother and in another conversation he told them that just the day before Wally was injured his nephew was ponying Sal's Son and the horse tried to bite him and he said, "I really worked that horse over." The nephew's and Dr. Salerno's interpretation of this episode was that the nephew was ponying Sal's Son and "the shank slipped out of his hand and the horse just pulled away from him and he stood there so I hollered at Bobby, I said, 'I will be right over. Stay right there. Just try to bring him over there. Stay over there so he don't run off,'" and then the doctor said, "I walked on up and grabbed the horse by the shank and I said a few things which I don't want to repeat and I yanked on the shank a few times and I turned on him this way (indicating) and I turned him around this way so he could get to walking and I handed him to Bob" and he went on. As to his first conversation with Wally, he said that he asked Wally what happened, Wally answered, "'The horse bit me.'" And the doctor said, "'It should never have happened, if I had been there it might not have happened.' I said, 'Couldn't you have used the figure 8?'"

■ Sal's Son was born in 1953, raced as a two-year-old, and Dr. Salerno raised, trained and raced him throughout his career and so he knew the horse as no one else could. The jockey, Wallace, testified to the horse's prior bad disposition

and attempts to bite, there was the episode of the previous day, the doctor's hospital conversation and, admittedly, the vicious attack on Wally. In all these circumstances the jury could reasonably draw the inference of knowledge of the horse's vicious propensities on the part of the doctor. Merritt v. Matchett, supra. The court summarized the situation in dealing with the case of a "muley cow" goring an elderly gentleman as he fled from a sidewalk bench and attempted to escape into his yard at 7614 North Broadway: "It is not essential to the owner's liability that he should have notice of the particular sort of act which produces the injury by an animal in a case like this. He must not wait until his dog bites somebody before taking notice of his dog's conduct, where it has been such as to warn a man of ordinary prudence that the animal is ferocious or vicious in disposition." O'Neill v. Blase, 94 Mo.App. 648, 667, 68 S.W. 764, 770.

Since, upon the grounds urged, the court did not err in overruling the appellant's motions for judgment, he contends that he is entitled to a new trial because the court (a) permitted plaintiff's counsel to impeach his own witness, Billeaud, and in so doing to indulge in inflammatory charges of misconduct on the part of the defendant, (b) permitted plaintiff to call the court bailiff to testify that he saw defendant speak to witness Billeaud, thereby implying that defendant was guilty of misconduct, and (c) permitted plaintiff's counsel to argue that his client's friends were afraid to come to court and testify in his behalf for fear of losing their jobs. These matters are all related and stem from one trial episode.

The plaintiff called as a witness a jockey, Charles Billeaud, and, without equivocation or qualification, he testified that he had known *Sal's Son* well, had both exercised the horse and ridden him in six or seven races at Cahokia and Fairmount in 1955 and 1956. He testified that the horse, Sal's Son, would "sulk" on him, throw him under the fence an "try to balk at the finish wire."

He was always a troublesome problem at the starting gates, he would "fight in the gates" and "tried to flip on me * * * fall over backwards and rear up and dive into it" and when he did go through the gate he left in "a sun fish * * * get up in the air and do a wiggle, a twist with you and try to drop you and he dropped me between him and the four horses * * *." Because of his conduct at the gate it was necessary "to school him" repeatedly. In the paddock he reared up and struck at the "jennet" (the groom), tried to paw him with both feet but Billeaud grabbed the shank and the horse "kicked back on me * * * and he put me in the hospital." On one occasion Sal's Son "flipped" Billeaud, broke the saddle off, and horse and jockey fought bare back. On another occasion the horse did a "sun fish" at the starting gate, "twisted and dropped me and when I hit the ground he tried to savage me" and the jockey was compelled to roll under the fence. He tried to "savage" the starter while he was being schooled. He said that the horse would run with his ears pinned back (an indication that a horse is about to bite or "savage" in some other manner) and "You just couldn't hit him. * * * Because he was mean. The only thing I can say is, he wouldn't take it." And finally, Billeaud said that "we" didn't know what was wrong with him, that is, "The trainer and I and the man that owns him." He said that he had discussed these matters with Dr. Salerno "More or less. The trainer would discuss it more than I would."

After some preliminary questions on cross-examination, counsel asked Billeaud whether 1955 was the first year Sal's Son appeared on the tracks (he was born in 1953 and was a two-year-old in 1955), and he said, "No, I don't believe it is," he was "pretty sure" the horse was a three-year-old in 1955. And then there were these questions and answers (all emphasis supplied):

"Q. Are you quite certain that it was *Sal's Son* that threw you? A. *Sal's Son?*

"Q. Yes. A. No, it was *Sal's Boy*.

"Q. It was *Sal's Boy* that threw you? A. You said Sal's Son.

"Q. Sal's Son is the horse that is on trial here."

At this point there was this interjection by the court: *"Let's don't have any coaching or any display.* I am sorry to interrupt. Proceed." Then Billeaud said that it was *Sal's Boy* who "savaged" him in 1956, that all along he thought plaintiff's counsel was talking about *Sal's Boy,* Sal's Son's "brother."

At this juncture counsel for plaintiff said, "This certainly takes me by surprise," and he requested and was granted permission to cross-examine the witness. Counsel reviewed with the witness some of his testimony on direct examination and pointed out that the questions and answers had all plainly referred to *Sal's Son.* And then he said, "And I will ask you this, while you were looking at him (defendant's counsel) if you could see the gestures made by this man (Dr. Salerno) back here? Could you see that? A. Yes, sir.

"Q. Who is that man? A. Dr. Salerno.

"Q. Could you see him making gestures? A. I was mostly looking at you and him (defendant's counsel). * * * I heard the Judge say something *and I seen his hand move back there.*

"Q. You saw his hand move? A. Yes. * * *

"Q. Didn't it give you a number? A. A number?

"Q. That is right, by fingers? A. No, sir. * * *

"Q. Isn't it a fact, that while you were looking at (defendant's counsel) and he was asking you how old the horse was when you ran it and you said three years old and Dr. Salerno held up two fingers and you changed it to

two years old? * * * A. I noticed he was moving but I didn't notice about the fingers, no, sir."

Then counsel developed the fact that Billeaud was a free-lance jockey, that he tried to please the owners, otherwise he would get no mounts. Later, when asked by defendant's counsel whether he was afraid to testify, he said, "I was a little afraid, yes, sir. My wife didn't want me to come up."

Somewhere in the course of this particular testimony there had been a recess and plaintiff's counsel propounded these questions to Billeaud:

"Q. Isn't it true that Dr. Salerno walked by you when you were seated with Mr. Barnes and he looked down at both of you and he said, 'Take it easy and watch what you say'? Isn't that true? A. No, sir.

"Q. He didn't say that? A. Jimmy was talking to me real loud and he (Dr. Salerno) said, 'Take it easy. Don't get excited,' and he slapped him on the shoulder.

"Q. He didn't say, 'Watch what you say'? A. No, sir."

It was at this point that plaintiff called the bailiff who said that he saw Dr. Salerno talking to Billeaud and waving his hands but he did not hear the conversation.

Dr. Salerno had this to say with respect to all these matters:

"Q. Do you know him (Billeaud) so well that you can sit back here where you were seated and shake your head and indicate answers from the witness stand? A. I wasn't indicating any answers to that gentleman.

"Q. *What were you doing when you held your fingers up?* A. *It was an emotional thing. He was saying that the horse was three years old in '55 and the horse was only two years old in '55*

*and he was talking about the wrong horse.*

"Q. So you gave him the right signal? A. No, I didn't. * * * The horse he was talking about was three years old.

"Q. And you told him it was two years old? A. If he listened to me he would have had the right horse.

"Q. If he listened to you he would have come up with the right horse? A. Yes, he would have had the right horse."

█ In these circumstances the appellant's noted objections may be disposed of summarily. While a jockey would not be expected to remember the 800 to 1000 horses he sees in a season, it is not at all likely that he would forget or be confused about Sal's Son and the two seasons with him he so graphically depicted on direct examination. Even so, plaintiff's counsel in apparent good faith relied on the witness and that he was "surprised," perhaps shocked, may not be doubted, and the court did not err in permitting plaintiff to cross-examine him. Myers v. Moffett, Mo., 312 S.W.2d 59; Ryan v. Campbell "66" Express, Mo., 304 S.W.2d 825. It may have been inadvisable, perhaps improper, to call the bailiff as a witness but he merely testified to the fact that he saw Dr. Salerno talking to Billeaud and waving his hands, a fact not really denied by anyone, and, the trial court having considered the matter, it may not be said that the incident was of "such serious import as to take it outside the area of judicial discretion, as a matter of law." Rovak v. Schwartz, Mo., 339 S.W.2d 756, 758. As to counsel's argument, the circumstances speak for themselves and it is not necessary here to characterize the incidents, Billeaud did say, "I was a little afraid, yes, sir. My wife didn't want me to come up." The significant incidents were in open court, most of them not even seriously denied, and, an "emotional thing" or not, there was indeed exasperating provocation for the conduct and argument of plaintiff's counsel.

And, again in the circumstances, the trial court did not abuse its discretion or err in refusing to grant a new trial upon the grounds assigned. Pritt v. Terminal R. R. Ass'n of St. Louis, Mo., 251 S.W.2d 622, 625–626.

█ Some of these matters, unfortunately, may have entered into the jury's award of damages and the meritorious question upon this appeal is whether the $32,000 verdict is excessive, and, therefore, under the general rules (Honeycutt v. Wabash R. Co., Mo., 337 S.W.2d 50; Breland v. Gulf, M. & O. R. Co., Mo., 325 S.W.2d 9, cases cited by the respondent) subject to remittitur by this court. The plaintiff's injuries were all to his right leg below the knee. From the horse's teeth there were four or five puncture wounds in the calf of his leg, these wounds have healed but the prints of the teeth remain and from the bite there is some "irreversible damage" to leg muscle. Wally was first admitted to an osteopathic hospital where antibiotics, antitetanus and sedatives were administered. There he underwent his first surgery to repair the lacerations and "hematomata." This operation consisted of "plastic repair of musclature and teflon implant." There was other routine treatment and other injuries were diagnosed, but on March 28, 1959, he was transferred to St. Luke's Hospital. Among his other injuries there was also a fracture of the right fibula, two or three inches below the knee, the leg was placed in a cast and on April 23 he was released from the hospital on crutches with his leg in the cast and on "limited ambulation." The cast was removed April 25 and dressings were continued and he was off the crutches on June 17. The fractured fibula has "soundly healed and in normal alignment."

By June 17, however, it was definitely established that there was also an injury to the superficial peroneal nerve in the area of the bite and his previous surgery. He returned to the hospital for two days for further treatment and observation to await the possibility that the nerve might heal. In the meanwhile his leg was supported by a

brace to overcome "this dropping of his foot." The brace was worn for several months but there was painful and persistent hypersensitivity all over the area and finally it was established that due to the nerve injury a neuroma had formed, a tumor-like mass within the substance of the superficial peroneal nerve. On March 1, 1960, he was re-admitted to St. Luke's Hospital and under local anesthesia "a fairly large neuroma * * * about the size of my little finger" was removed. The incision, which has healed, was fourteen inches long and in removing the neuroma this portion of the nerve was "dissected out" and "the effect of removing the neuroma was successful." He was released from the hospital on March 5 and is yet under the care of his orthopedic surgeon. There may be another small neuroma in another area and it is possible that it will have to be removed.

As indicated, there is some irreversible muscle injury and the calf of his leg has atrophied one inch. Because of the muscle and nerve injury there is some foot drop. It is the opinion of the doctor that the described injuries are permanent and there is "some impairment in his ability to ride." The doctor proposes continued treatment, particularly therapy, but "he is ambulatory and working" and eventually will be able to do without the leg brace. He has had medical expense of approximately $1,000 to $1,500 (the court has been compelled to unearth all this information incidentally). At the time of the injury his full-time employment was as an automobile salesman at $125 a week and he lost one month's pay. At the time of the trial he had been employed for a month by a company selling prefabricated houses and was being paid $100 a week. The only evidence as to his earnings as a jockey was that in the August to October 1958 season he earned "two or three thousand, something like that." He is now thirty-seven years old, has been a jockey since age sixteen, and there is no evidence as to how long he may be able to follow that part-time occupation.

From this brief résumé of the plaintiff's injuries it is obvious that he has sustained a serious and painful injury, and his evidence is undisputed. Nevertheless, he has not lost a leg (Petty v. Kansas City Public Service Co., 1946, 354 Mo. 823, 191 S.W.2d 653) and, even though he has permanent injury, he has not lost the use of a leg. Mayor v. St. Louis Public Service Co., Mo.1954, 269 S.W.2d 101. In short, considering all the factors, including the persistent decline in the purchasing power of the dollar, this verdict is excessive by at least $8,500. Bowyer v. Te-Co., Inc., Mo 1958, 310 S.W.2d 892, 900–901.

If, therefore, the plaintiff will within fifteen days from the date of the filing of this opinion, file in this court a remittitur of $8,500, the judgment will stand affirmed as of the date of its rendition for the sum of $23,500. Otherwise, the judgment is reversed and the cause remanded.

BOHLING and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.

All concur.