JOSEPH ARTHUR BANKS v. JAMES A. MAXWELL.

(Filed 11 October, 1933.)

**Animals B a—Evidence held insufficient to warrant recovery by plaintiff for injury sustained when gored by bull.**

In order to recover for an injury inflicted by a domestic animal plaintiff must show that the animal was vicious or dangerous and that the owner had knowledge, actual or constructive, of the vicious propensity of the animal, and in this action to recover damages by an employee on a farm for injuries sustained when plaintiff was gored by a bull that he was instructed to take to pasture, defendant's motion as of nonsuit was properly granted, there being no evidence that the bull had ever previously attacked any person or had given signs of viciousness, or that defendant had knowledge of any vicious propensity in the animal, and, *held further*, the bull's habitual bellowing and pawing of the ground when taken to pasture was not evidence of vicious propensity, such actions being normal behavior in a bull.

CIVIL ACTION, before *McElroy, J.,* at March Term, 1933, of HENDERSON.

Plaintiff instituted this action to recover damages for serious injuries sustained by being gored by a bull owned by the defendant. The plaintiff was a boy eighteen years of age, and had been raised on a farm, and on 10 July, 1931, was working on the farm of defendant.

The narrative of the injury is substantially as follows:

"Mr. Maxwell had a bull on the place, but prior to 10 July, 1931, I had never been called upon to perform any service whatever in regard to the bull. I had never had any experience and did not know anything about handling bulls. Mr. Maxwell never told me or gave me any instructions about how to handle the bull. . . . The bull was kept in a pen back of the dairy barn, and the pen was between twenty and thirty by sixty feet. . . . The lot was enclosed and made out of rails and poles and was built on one side of the barn. . . . The bull was in this lot or pen on the morning of 10 July, 1931, at the time I finished milking. The pen had a gate leading into it. On the morning of 10 July, 1931, after I had finished milking, Mr. Maxwell told me to take the bull out of the lot and drive him to the pasture. He told me to go into the pen and run him out. When he told me to go into

the pen I at first hesitated. I had no idea what the brute was. . . .
I picked up a club and started in, but he told me not to hit the brute
with the club and I dropped it. I had not any more than dropped it
until he turned on me, knocked me down and gored me. He rolled me
around and gored me. . . . He was rolling me with his head. He
pushed me to the lower side of the pen and I got out of the pen. . . .
In the thirty days prior to July, 1931, I worked for Mr. Maxwell not
less than ten days. I suppose I worked for him more than a third of the
time. . . . Sometimes when I came in early I saw them driving
the bull in and I had seen them driving him out. Sometimes my brother
drove him out. He is eighteen years old. . . . I never saw anybody
have trouble taking him out. I had never seen anybody put the dogs on
him and drive him to the pasture. . . . I had seen Arthur Lance
drive him. He is about twenty-five years old. He was just coming on
behind him and the bull was just going on into the pen. . . . I have
heard some people talk about bulls, but I did not know anything about
that one. . . . Before going into the pen I picked up a stick. The
stick was about the size of my arm and about eighteen inches long.
. . . Mr. Maxwell told me not to hit him. I don't know how close
I was to him when I raised the stick. I went to draw it back and when
I did he told me not to hit the bull. . . . My brother had not been
attending to the bull very long—not more than a month and a half, if
that long. . . . After the bull had me down and was goring me Mr.
Maxwell hissed the dog on the bull. I don't know if the dog was there
when I went into the pen, but while the bull had me down the dog com-
menced barking and I suppose Mr. Maxwell hissed him on."

Another witness for plaintiff said: "I drove the bull from the pen
to the pasture and drove him back in. Sometimes Lance would drive
the bull, but I drove it most of the time. . . . When I would drive
the bull from the pen down to the pasture he would bellow and paw the
ground and burrow in the ground with his head all the way down the
pathway. Sometimes he would stop and refuse to go on. . . . When
I would drive the bull from the pen to the pasture he behaved all the
way down and almost every day as I have described already."

At the conclusion of plaintiff's evidence there was judgment of non-
suit and the plaintiff appealed.

*R. L. Whitmore for plaintiff.*
*Redden & Redden for defendant.*

BROGDEN, J. What are the essentials of liability for injury inflicted
by a bull?

The ancestry and social standing of a bull antedates the pyramids of
Egypt. Indeed, the written record reveals that in the first civilization

along the stretches of the Nile a bull was a god. He was an emblem and symbol of vitality and ancient Egyptians worshipped vitality. The same impulse therefore that constructed the pyramids also endowed the bull with divinity.

It is true that his fighting qualities have often been used for describing fear. For instance, the Sweet Singer of Israel, attempting to describe his sense of fear and depression, wrote: "Many bulls have compassed me; strong bulls of Bashan have beset me round. They gaped upon me with their mouths as a ravening and roaring lion." Psalms 22:12-13.

The familiar rule of liability for injuries inflicted by cattle has remained approximately constant for more than three thousand years. This rule of liability was expressed by Moses in the following words: "If an ox gore a man or a woman that they die; then the ox shall be surely stoned and his flesh shall not be eaten, but the owner of the ox shall be quit. But if the ox were wont to push with his horn in time past, and it hath been testified to his owner, and he hath not kept him in, but that he hath killed a man or a woman; the ox shall be stoned, and his owner also shall be put to death. If there be laid on him a sum of money, then he shall give for the ransom of his life whatsoever is laid upon him." Ex. 21:28-30.

This Court declared in *Rector v. Coal Co.*, 192 N. C., 804, 136 S. E., 113, that a person injured by a domestic animal, in order to recover damages, must show two essential facts: (1) "The animal inflicting the injury must be dangerous, vicious, mischievous or ferocious, or one termed in the law as possessing a vicious propensity." (2) "The owner must have actual or constructive knowledge of the vicious propensity, character and habits of the animal." The same principle was announced in *Cockerham v. Nixon*, 33 N. C., 269, this case involved an injury committed by a bull.

In the case at bar there was no evidence offered tending to show that the bull had ever attacked a person or threatened to do so, nor that he was "wont to push with his horn in time past"; nor was there evidence that the owner had actual or constructive knowledge of any vicious propensity of the animal. It is true that a witness said that each morning when the bull was turned out of the pen "he would bellow, paw the ground, and burrow in the ground with his head." Those bred to the soil perhaps know that such acts on the part of a normal bull constituted *per se* no more than boastful publicity or propaganda, doubtless designed by the animal to inform his bovine friends and admirers that he was arriving upon the scene.

At any rate the trial judge correctly interpreted the prevailing principle of law as held and promulgated in this State.

Affirmed.