EDITH CRAWFORD, RESPONDENT, v. KANSAS CITY STOCK YARDS COMPANY, APPELLANT.—73 S. W. (2d) 308.

Kansas City Court of Appeals. January 29, 1934.

*R. R. Brewster* and *Moore, Smith, Aughinbaugh & Ault* for respondent.

*Borders, Borders & Warrick* for appellant.

CAMPBELL, C.—Plaintiff, on September 17, 1929, while walking upon Tenth Street near Main Street in Kansas City, Missouri, was severely injured. Her injuries were caused by a steer, which had escaped from the stock yards of the defendant Kansas City Stock Yards Company, running against and falling upon her. She brought this action against the Kansas City Stock Yards Company and William M. Liggett to recover damages for her said injuries. A trial of the cause resulted in verdict and judgment in favor of the defendant Liggett and verdict and judgment in the sum of $5000 against the Kansas City Stock Yards Company. The Kansas City Stock Yards Company, hereafter called defendant, has appealed.

On the day plaintiff was injured seventy-four head of cattle consigned to Liggett were shipped into the yards, received, unloaded and driven by defendant into a pen which had been allotted to Liggett. The gate of the pen was locked at night and unlocked by defendant in the daytime when Liggett was "selling cattle." Neither Mr. Liggett nor his employees had a key to the lock.

Later in the day on which the cattle were received Mr. Liggett and two of his employees drove fifty head of them from the pen into an alley, intending to take them to scales 9 and 10. While on the way the steer which struck and injured plaintiff became unmanageable, "jumped" by its drivers, ran along the alley and escaped through an open gate at the southwest corner of the defendant's Exchange Building and onto a public street in Kansas City. The gate when closed "cuts off the whole stock yards from the street."

Mr. Smith, a witness for Liggett, testified:

". . . that ordinarily and customarily the manner of taking fifty head of grain fed steers from Mr. Liggett's pens to the scales is as follows: one man is sent ahead and one man behind and the man ahead, equipped with a club or whip, turns the cattle south from the main east and west alley to scales 9 and 10; that the number of cattle handled in the yards varies from a few hundred to over 50,000 a day; that he supposed the Stock Yards Company maintained the outer gate; that his guess was that the distance from the east end of the east-west main alley to the gate was 200 feet and from the scale outside the yards to the gate, fifty feet; that he had once closed the outer gate himself to prevent a steer getting out; that he knew of but two steers getting out in twenty-nine years; that they never holler for help until after a steer gets by."

Mr. Jackson, Liggett's employee, testified that:

"After I fought this steer as long as I could and saw he was clear away from me, that I could not do anything more to stop him, I hollered to hold him up as Mr. Smith testified this morning was the first thing we do.

676

"Q. Is that the way you always do.? A. Yes, 'hold him up' or 'shut the gate.'

"Q. Did you yell that? A. Yes.

"Q. How loud. A. Plenty loud, so anyone anyways near could hear me.

"Q. Was it loud enough for the gate man down there to have heard you? A. Yes, sir.

"Q. Did you observe anybody on to the east of you take up the shout? A. Oh, yes, there were several fellows along the fence there and as I testified this morning when anything starts to get away that is the cry everybody raises 'shut the gate' or 'hold him up.'

"Q. Did you hear those cries made there ahead of the steer? A. Several places.

"Q. Then, what did you do? A. Instead of following the steer, I ran south.

"Q. In this east alley of the double alley? A. Yes.

"Q. How far south did you have to run until you were on a line with the gate? A. Just forty-three steps.

"Q. Then, what did you do? A. Climbed upon the fence to see if the steer had turned south at the Exchange Building or north. I saw he was turning north and I hollered again to shut the gate.

"Q. Did you see what the gate man did then? A. He was starting towards the gate.

"Q. When you got up there you saw him start toward the gates? A. Yes, he had already started.

"Q. Did you jump down and run over? A. Yes, to the south side of the fence, and crawled over.

"Q. And when you got there, what happened? A. The steer had already gone by Mr. Silby."

Mr. Silby, known as the gate man, was an employee of the defendant and his place of work was at or near the gate.

Mr. Liggett testified as follows:

"My recollection is that about one-third of those steers started south going to the scales and something scared them and they surged back and of course we had quite a fight there. They got pretty badly scared. People on the fence and going through the cattle and they began to mill around and around and around. We had quite a battle there with them and finally got them off into the scales—the bulk of them. . . .

"Q. You knew if a steer did get away and get through that open gate it would be out on the streets? A. Naturally.

"Q. And you knew that would be a pretty dangerous thing if one of those steers broke out of the stockyards and went running up and down the sidewalks of Kansas City, didn't you? A. Yes, sir.

"Q. As a matter of fact, Mr. Liggett, a steer from the country

loose in that way on the sidewalks of a populous city where there are women and children and people walking along, would be about as dangerous a thing as you could imagine? A. Rather dangerous.

"Q. Rather dangerous. And you, of course, as a cattle man recognize that fact? A. Yes, sir.

"Q. And as a cattle man through your years of experience you have learned to know that cattle being driven and herded and held together are likely to mill? A. Yes,

"Q. And once milling, you are likely to have to fight them, is that right? A. Yes.

"Q. And once you have to fight them some of them are apt to get by you, that is true, isn't it? A. Yes."

Mr. Elrod, a witness for defendant Liggett, testified that he was a member of a commission firm operating in the stock yards; that in his experience, covering a period of thirty-two years in the yards, he had known of *very few escapes* "out through the main gate," and that the defendant "keeps a man at some scales near that gate; that a few times the gate has been shut to keep cattle in; . . . that usually the gate man shuts it but that anyone that happened to be near the gate and saw the cattle also did." The witness further testified "that formerly pens were allotted by a pen committee appointed by the Live Stock Exchange and the Stock Yards Company, but that recently the Stock Yards Company had taken it over."

In plaintiff's additional abstract it is shown that Mr. Smith testified that an ordinary steer taken to the stock yards with a bunch of steers "and things strange to him, they are liable to break away;" that he had seen the gate closed "in time to stop cattle;" that he had heard of steers getting away from other commission men "and it is common knowledge that they do break away and get out."

The defendant contends that the court erred in refusing to direct verdict in its favor for the following reasons: (1) That the defendant had neither custody, control nor possession of the steer at the time of its escape; (2) that the negligence of defendant, if any, was not the proximate cause of plaintiff's injuries, and that (3) there was a fatal variance between the allegations and the proof. In determining the question, plaintiff is entitled to have the evidence in her favor taken as true and to have the benefit of every reasonable inference to be drawn therefrom. [Roan v. Wells, 14 S. W. (2d) 488; Morris v. Atlas Portland Cement Co., 19 S. W. (2d) 865, 872.]

The defendant presents the case upon the theory that the evidence conclusively shows that the defendant had neither custody, control nor possession of the steer at the time of its escape. The rule invoked is that "one is not liable in damages for injuries inflicted by an animal which he does not own, harbor or control." [3 C. J. 105.]

Mr. Jackson further testified:

"Q. When you were driving these cattle over there inside this

stockyards, were you going where the Stock Yards Company had directed you to take them? A. Yes.

"Q. To this scale? A. Yes.

"Q. Who operated the scale? A. Kansas City Stock Yards Company employees.

"Q. When you got them there, did they carry the cattle over to the packer or whoever bought them? A. We would close the gate and our work with them ceases right there.

"Q. All right. Now, as to the control over these cattle anywhere, did you have anything to do with the outside facilities of this stockyards? A. No.

"Q. Or did Mr. Liggett? A. No, sir.

"Q. I think that is all—just a minute—now, if it hadn't been your turn at the scales there, this scale of the Kansas City Stock Yards Company, would the Stock Yards Company have made you wait in the matter of moving those steers until it was your turn? A. Yes, sir; we would have to wait our turn.

"Q. If necessary, and they had to get other cattle down, they could have ordered you to put them back into your pens? A. Yes, sir.

"Q. Until the next turn came around? A. Yes. . . .

"Q. They tell you where to put the cattle and they give you the turn that you have at the scales? A. Yes.

"Q. Designate which scales you shall take them to? A. Yes.

"Q. And of course, you have got to take them down the alleys that are arranged for those scales? A. Yes.

"Q. They tell you what alleys to take and they furnish the alley into which you are to drive them? A. Yes.

"Q. They furnish the equipment for that alley? A. Yes."

The defendant owned and controlled the yards and it is apparent that it controlled or directed every movement of cattle therein. In the circumstances the defendant in a legal sense had control of the steer at the time of its escape. The term "control" means "power or authority to check or restrain; restraining or directing influence; regulating power." [13 C. J. 838.]

Were we to sustain the defendant's contention that though it negligently permitted the steer to escape from its yards and injure plaintiff it was not liable therefor, then we would in legal result say that defendant owed no duty to the public to exercise due care to prevent the escape of cattle from its yards. This, we decline to do.

The defendant contends that the negligence charged was not the proximate cause of plaintiff's injuries. There must be casual connection between defendant's negligence and plaintiff's injuries to impose liability on defendant. In the case of Hogan v. Fleming, 297 S. W. 404, 409, it was ruled: "The primary cause will be the proximate

cause where it is so linked and bound to the succeeding events that all create or become a continuous whole, the one so operating on the others as to make the injury the result of the primary cause.''

In the case of Harrison v. Electric Light Company, 195 Mo. 606, 625, the court said:

''If a defendant is negligent and his negligence combines with that of another, or with any other independent, intervening cause, he is liable though his negligence was not the sole negligence or the sole proximate cause, and although his negligence without such other independent, intervening cause could not have produced the injury.''

Applying the rule to the facts of this case it is apparent that we cannot judicially say that the escape of the steer was not the proximate cause of plaintiff's injuries. The question was for the jury.

It is also insisted by defendant that there was a fatal variance between the allegations and the proof. The petition alleged that defendant had under its control a number of wild steers which had been shipped to its yards. Plaintiff's witness said that the steer which escaped was a ''Kansas grass steer.''

Webster's New International Dictionary defines wild as ''impatient of, or not subjected to, restraint or regulation.'' The actions of the steer demonstrated that it was wild and unruly. While in the yards an experienced cattle driver, though armed with a club, could not restrain it. There was no variance between allegation and proof.

The defendant says that plaintiff's instruction No. 1 was erroneous for the reason that it did not submit to the jury the question as to whether or not the defendant had possession or control of the steer at the time of its escape. We have stated the facts and need not restate them. Suffice it to say that the effect of the evidence of both plaintiff and defendant was that the latter had such control of the steer at the time of its escape that the law will impose liability upon defendant for damages resulting from the escape in event the escape was caused by it negligence.

The defendant requested the court to give its instructions Nos. 6, 11, 23 and 30. The request was refused. The defendant sought in the refused instructions to have the question as to whether or not defendant was in possession or control of the steer at the time it departed from its yards submitted to the jury. The instructions were properly refused for the reason that defendant was in legal control of the steer during all of the time it was in defendant's yards.

The defendant in its instruction No. 17 requested the court to instruct the jury that if it found that defendant was negligent and that Liggett was also guilty of negligence, and that the latter's negligence followed the negligence of defendant in point of time, and that the negligence of defendant ''simply made possible the act of negligence of Liggett,'' if any, and that the negligence of Liggett ''was efficient in causing the injuries of the plaintiff,'' and that the

negligence of defendant did not directly cause or contribute to the injuries of plaintiff then plaintiff could not recover. We do not find evidence tending to show that Liggett was guilty of negligence. He drove the cattle from a pen into the alley. Until the animals were in the alley there was nothing to indicate that they were unruly. While on the way to the scales they began to "mill" and one of them "jumped" by Liggett and his helpers. The evidence was that Liggett and his employees exerted themselves to the utmost to prevent the steer from running by them. Hence, there was nothing upon which to base the instruction.

In its requested instruction No. 32 the defendant sought to have the jury told that if it found that after the steer had run by the employee of Liggett the defendant "did not know or could not have by the exercise of reasonable diligence known of such fact" in time to have closed the gate, then plaintiff could not recover. The defendant has not called attention to any evidence upon which to base the instruction and we have found none.

In its refused instruction No. 33 the defendant sought to have the jury told that unless the defendant knew or in the exercise of reasonable care could have known that one of the steers mentioned in evidence would escape from the control and custody of Liggett, then plaintiff could not recover. It should not be said that plaintiff could not recover unless she proved that defendant *knew* or could have known that one of the steers would escape. The defendant was charged with notice that a steer might run by its driver but it was not charged with notice that one of the fifty steers *would* run by the employee of Liggett. Furthermore, the instruction was misleading for the reason that it assumed that Liggett had control of the steer.

The judgment is affirmed. Reynolds, C., concurs.

PER CURIAM:—The foregoing opinion of CAMPBELL, C., is adopted as the opinion of the court. The judgment is affirmed. All concur.