LARWOOD WESLIE ALEXANDER, RESPONDENT, v. OLIN CROCHETT ET AL., APPELLANTS.—124 S. W. (2d) 534.

Kansas City Court of Appeals.   January 30, 1939.

*Borders, Borders & Warrick* for appellant, K. C. Stock Yards Co.

*O'Hern & O'Hern, John F. Cook* and *Leon Greenebaum* for respondent.

SPERRY, C.—Larwood Weslie Alexander, hereinafter called plaintiff, sued defendants, Kansas City Stock Yards Company, a corporation, F. E. Watkins, and Olin Crotchett for damages because of injuries sustained by plaintiff when he was attacked by a bull. The cause as to all defendants, was submitted to a jury and there was a verdict, and judgment was rendered thereon, in favor of plaintiff and against defendant Kansas City Stock Yards Company; but there was no verdict whatever, and consequently, no judgment, regarding either of the remaining defendants. The Stock Yards Company, hereinafter called defendant, appeals.

In stating the facts we shall do so from a standpoint most favorable to plaintiff. [Willhauch v. Chicago, R. I. & P. Ry. Co., 61 S. W. (2d) 336, 1. c. 338.]

Crotchett trucked a load of cattle to the stockyards of defendant. Included therein was a bull. There is sufficient evidence from which it may be inferred that this bull was a "bad," "mean," or "vicious" animal, as distinguished from the average run of ordinary bulls, which latter, according to the evidence, must be watched at all times since it is the nature of all bulls to be unstable, changeable, capricious, dangerous, and likely to attack and injure human beings upon very slight provocation, or for no apparent reason at all. Crotchett knew of the bad disposition of the bull.

Defendant, by law, is required to furnish its facilities to any and all shippers of livestock upon reasonable request, without discrimination. [Section 205, U. S. C. A., Title 7.] The evidence shows that truckers were required to, and that Crotchett did, fill out a shippers ticket in triplicate, for each owner of delivered livestock, showing thereon the name of owner, description of stock, to whom consigned, name of trucker, and other information. When the load was a mixed load, as in this case, containing shipments from several owners, it was required that each of said tickets show particular markings of the stock so that same might be distinguished when being separated and taken out of the pen in which the whole load might be confined.

Crotchett complied this requirement and the bull was described on this ticket as: "Bull. Big Guernsey."

The tickets were delivered to Watkins, who was the dock foreman of defendant, and the bull was received by employees of defendant and was penned with other cattle in pen T. 121. No inquiry was made by Watkins or by any other employee of defendant, regarding the special characteristics of the bull, as to his being dangerous or otherwise; and no information on this subject was given to or obtained by any employee.

It was shown by evidence that there was a custom prevailing at the stockyards whereby if defendant's employees learned at the time of receiving stock that any animal received was dangerous or vicious such information was noted on the ticket above described for the information of men employed in the yards; if such information was later received, during the course of handling the animal, same might be passed on to others by the noting of it on the ticket by the person who then had possession of said tickets, or by passing it on from person to person by word of mouth, or by both methods. This was the general custom observed by employees of defendant as well as by those of other concerns working in the yards. Sometimes employees of defendant, at the truck docks where cattle were received and unloaded, inquired of the truck driver, who, in 95 per cent of the cases was not the owner and therefore knew nothing of the characteristics of animals contained in the loads delivered. But no witness testified that this was an invariable custom. It was more often done than otherwise; but often it was not done. The only custom shown in this connection was that *when* it was learned, at the unloading dock, that certain animals were dangerous, such information was noted on the ticket.

It was also shown that in some cases bulls received at the trucking docks were penned separately; but this was not always done, and, on days when receipts were unusually heavy, as was the case on the day in question, such bulls were not usually penned separately. The purpose of penning bulls separately was to prevent them from "riding" cows and heifers and possibly breaking them down, and to prevent them from exercising their propensity of knocking other cattle around to their injury. That was the primary purpose; but, incidentally, it was also shown that when bulls are penned separately their disposition as to being docile or dangerous may be more easily determined than when they are penned with other cattle. But there was no evidence that there was any rule, regulation, or law requiring bulls to be penned separately for any purpose; nor was there sufficient evidence to establish such a custom, especially on days when receipts were heavy, as they were on this day. Observation of the traits of bulls was not the purpose or object of pen-

ning them separately; nor was there evidence that such information, if obtained in this manner, was invariably noted on tickets. The tickets were sent to the office immediately after receipt of the stock and were not shown to be held pending observation.

Plaintiff was not an employee of defendant, but was employed by Hunt & Carter (the latter being plaintiff's brother-in-law), who were engaged in the business of driving stock from the pens where they were confined by defendant upon receipt, to the various commission men to whom they were consigned.

Mr. Hunt, a witness for plaintiff, obtained the tickets for this bull, together with tickets for other cattle destined to the Laird Commission Company, at the office, where said tickets had been sent by Watkins. Hunt went to pen T. 121, where defendant had confined the bull and other cattle, and an employee of defendant, who had the key to the lock on the pen, unlocked it, whereupon Hunt drove the cattle out. On cross examination he testified to the following incident:

"Q. Now, lets see, you got up on the fence? A. Yes, sir.
"Q. Before the gate was open? A. No, sir.
"Q. After the gate was open? A. Yes, sir; when the bull was in the alley, when he started back.
"Q. Why did you get up on the fence? A. Well, I don't know.
"Q. Well you did not just jump up on the fence? A. Well, the bull might have snorted a little bit or something like that and I got up there."

He scared the witness: . . . "he snorted a little bit and put his head down on the ground." Witness did not mark anything on the ticket he then had in his possession nor did he tell plaintiff or any of his other employees that the bull was dangerous or vicious, which, he said, he would have done if he had known the bull was bad.

On re-direct examination his evidence on this point was as follows:

"Q. Was this Kansas City Stock Yards' man that let you into that pen, was he there at the time this bull—this little incident happened there in the alley? Do you know? A. Yes, sir; he was there."

Plaintiff urges that this incident was sufficient to notify defendant that this was a vicious and dangerous bull; and unless this is sufficient evidence upon which a jury may base such a finding, then defendant had no knowledge of the exceptionally dangerous character of the bull. The evidence was overwhelming to the effect that all bulls are capricious and dangerous and may attack a man for no apparent reason and that one should always be extremely cautious when near them. That is a characteristic of bulls, as bulls; and plaintiff had knowledge thereof. It is written that even the quiet and peace loving Ferdinand was distracted from his bovine con-

682

templation of flowers, of which he was inordinately fond, and to which he was addicted, and aroused to a ferocious rage when he was unexpectedly stung in a susceptible spot by a bumble bee.

However, *apropros* of the incident related by Hunt, it was said in Banks v. Maxwell, 205 N. C. 233, 1. c. 235, that snorting, blowing, pawing the dirt, and burying his head in the ground is a species of braggadocio to which all bulls are more or less addicted, and is not, *per se*, sufficient evidence of viciousness as to charge his owner with knowledge that he is a bad bull. Bulls as a class engage in such behavior much as young men swell their muscles in the presence of their associates, and as gobblers strut before their harems. It is an expression of their pride of strength and masculine charm. It is apparent that the witness, while he took no unnecessary chances, viewed the bull's behavior in much that light; and he stated that he did not consider him unusually dangerous. Since he, an experienced cattleman, so viewed the incident in the light of his knowledge of bulls as a class, no doubt the unknown employee of defendant so viewed it also, if, in fact, he saw the incident. This incident, under the circumstances here shown, considering the reason stated by the witness for his failure to note it on the ticket or to pass it on to his employees, including plaintiff, did not charge defendant with knowledge of the bull's bad character. Plaintiff, whose duty it was to prove facts from which notice may be inferred or presumed (if notice is requisite), failed to adduce sufficient facts for this purpose.

Hunt drove the bull, and other cattle, to pen T 67, and thereafter delivered the tickets to plaintiff's brother, Archie, who, with plaintiff and another brother, went to drive them from that pen to Lairds' . . . When plaintiff entered the pen to drive the cattle out, after opening the gate, some nineteen head started out but this bull and one cow lingered. Plaintiff reached over the cow and tapped the bull on the nose with a heavy cane, turned his head to see whether the other cattle were going all right, and when he looked back the bull was charging him. The injuries resulted.

Is defendant liable for failure to warn plaintiff of the bad character of the bull by noting same on the ticket? Defendant had no such information in fact; but, since such information, we infer from the evidence, could have been obtained from Crotchett by inquiry, was defendant required to exercise reasonable care and diligence to so obtain same and pass it on, and failing such reasonable diligence, is it liable on the grounds of negligence? Defendant's contention is that the answer to the above question is "no," and that, therefore, its demurrer, offered at the close of the case, should have been given.

In stating the above proposition we have passed over the question of whether plaintiff's brother, Archie, who had the ticket in his possession at all times (plaintiff never saw it or asked to see it), and

who never read its contents to plaintiff, nor was asked so to do, would have told plaintiff of such a notation on said ticket, had same been there. While it is urged by defendant that our answer to the last question must be based on mere conjecture, we think that, considering the evidence that many such tickets did contain such information, the dangerous character of the work of handling stock, which was well known to both plaintiff and Archie, and the general custom undoubtedly prevailing in the yards among men engaged there to pass such information on to their co-workers when they obtained same thru the tickets, by observation of the animals, or by word of mouth from others, such information would have been given to plaintiff. Such a conclusion would not be based on conjecture, but may be reasonably inferred from all of the facts in evidence.

The Supreme Court of North Carolina, in the case of Banks v. Maxwell, 205 N. C. 233, l. c. 235, said:

"The familiar rule of liability for injuries inflicted by cattle has remained approximately constant for more than three thousand years. This rule of liability was expressed by Moses in the following words: 'If an ox gore a man or a woman that they die; then the ox shall be surely stoned and his flesh shall not be eaten, but the owner of the ox shall be quit. But if the ox were wont to push with his horn in time past, and it hath been testified to his owner, and he hath not kept him in, but that he hath killed a man or a woman; the ox shall be stoned, and his owner shall be put to death. If there be laid on him a sum of money, then he shall give for the ransom of his life whatsoever is laid upon him.' Ex. 21; 28-30."

According to the law of Moses, then, one is liable for damages caused by his bull only if it is proved that: 1. . . . he "were wont to push with his horn in time past," and 2. . . . "it hath been testified to his owner." Such is the law of Missouri. [Beckett v. Beckett, 48 Mo. 396, l. c. 397; Clark v. M. K. & T. Ry. Co., 179 Mo. 66, l. c. 85; Clinkenbeard v. Reinert, 284 Mo. 569, l. c. 577; Staetter v. McArthur, 33 Mo. App. 218, l. c. 221; Schroeder v. Faires, 49 Mo. App. 470.] This also is the general rule in other jurisdictions. [Banks v. Maxwell, supra; Field v. Viraldo, 141 Ark. 32, l. c. 37; McIntyre v. Prater (Ark.), 74 S. W. (2d) 639; Dufer v. Cully, 3 Oregon, 337, l. c. 378; 1 R. C. L. 1089.] We have judicially determined herein that this bull "were wont to push with his horn in time past;" but we have also determined that "it hath not been testified to his owner." (We have treated defendant as standing in the shoes of the owner, for the reason that it had legal control of the bull.) [Crawford v. Kansas City Stock Yards Co., 73 S. W. (2d) 308, l. c. 311.]

Plaintiff claims that he was an invitee of defendants on the latter's premises. We think that is correct and that defendant's liability

is measured by his duty to an invitee. [Gilliland v. Bondurant, 59 S. W. (2d) 679, l. c. 688.] It owed him the duty to warn him of a danger known to it and unknown to plaintiff. [Ilgenfritz v. Missouri Power & Light Co., 101 S. W. (2d) 723, l. c. 725.] But here plaintiff was possessed of all of the facts actually known to defendant. [Clark v. M. K. & T. Ry. Co., *supra.*] This being so, and the case here considered not being a master and servant case, or a passenger case, or the like, we think superior knowledge on the part of defendant as to the dangerous character of the animal was absolutely necessary in order to make it liable in this action. [Cash v. Sonken-Galamba Co., 17 S. W. (2d) 927, l. c. 929, 930.]

We have found no case holding that the owner is required to make inquiries as to the dangerous propensities of an animal when he actually had no such knowledge, nor was possessed of facts which should put a reasonably prudent person on inquiry. The only case plaintiff urges as analagous is that of Gallagher v. Kroger Grocery and Baking Company, 272 S. W. 1005. There a vicious appearing bull dog, unmuzzled, was permitted in the store for a period of twenty minutes, during which time it lunged at several customers, and eventually it bit the plaintiff. The court said that the dog was vicious and should have been shot long ago. Defendant's servants were in the store at all times and the court held:

"While defendant owed plaintiff the duty of keeping its place reasonably safe for the customers who had occasion to purchase goods there, it was not an insurer of the safety of such customers. These servants of defendant were only required to exercise the care that reasonably prudent men would exercise under the same or similar circumstances, and when they had no knowledge of the vicious character of this dog, *and no reasonable opportunity had been afforded them to acquire such knowledge,* defendant could not upon any theory be held liable." (Italics ours.)

It is difficult to reconcile the italicized portion of the above language with the fact that the dog was there in the presence of defendant's servants for a period of twenty minutes during which time he lunged at several customers, and that the owner was present from whom inquiry could have been made. However, we think the court did not mean to hold, and that it did not hold, that a defendant is required to make inquiries regarding the character of every animal passing through its yards in such cases as the one before us, where some eighteen thousand head of cattle alone (not to mention some ten thousand head of swine, calves and mules), were handled on the day of this accident, and where such inquiry would elicit no information whatever concerning said matter in more than 5 per cent of the cases. The unreasonableness of such a ruling, considering the business of defendant and the dispatch with which it must be handled, together

with the meager benefits obtained thereby, is apparent. It would result in extending the duty owed by defendant to an invitee beyond its present scope and render it liable for injuries if it could have learned of hidden dangers of which it, as well as plaintiff, was wholly ignorant.

Plaintiff, probably with the above law in mind, places chief dependence on his claim that his injuries are the result of his reliance upon defendant's custom to inquire regarding the dangerous character of animals, and to warn him thereof. He was not justified in relying on a custom that did not exist except in the haphazard manner herein mentioned.

Several other alleged errors are urged but in view of our opinion that the demurrer should have been sustained we have limited this opinion to a consideration of that matter alone.

The judgment should be reversed. *Campbell, C.,* concurs.

PER CURIAM:—The foregoing opinion of SPERRY, C., is adopted as the opinion of the court. The judgment of the circuit court is reversed. All concur.