Patricia Ann ROBIDOUX, a Minor, by Melvin M. Robidoux, Her Guardian and Father, (Plaintiff) Respondent,

v.

August A. BUSCH, (Respondent) Appellant.

No. 31736.

St. Louis Court of Appeals.

Missouri.

Feb. 15, 1966.

Rehearing Denied March 17, 1966.

Jenny & Cole, James A. Cole and Lawrence O. Davis, Union, for appellant.

Bruce Nangle, St. Louis, for respondent.

RUDDY, Presiding Judge.

Plaintiff, an eight year old girl, brought this action by and through her father against Anheuser-Busch, Inc., a corporation, and August A. Busch, an individual, to recover damages for injuries sustained when she was run over by the wheel of a wagon pulled by six miniature mules while she was on a sightseeing tour through Grants Farm, a well known showplace in St. Louis County, owned by defendant, August A. Busch. A motion for directed verdict filed at the close of plaintiff's case by Anheuser-Busch, Inc., a corporation, was sustained. Defendant, August A. Busch, appeals from a judgment against him in the amount of $8000. We shall refer to the parties in this appeal as plaintiff and defendant.

Among the many points relied on by defendant is one wherein he contends that the trial court erred in overruling his motion for a directed verdict at the close of the whole case because the competent evidence was insufficient to support a verdict against said defendant. We think this contention of defendant should be sustained. Therefore, it will be unnecessary to consider the other points relied on by the defendant.

In determining whether the trial court erred in failing to sustain the defendant's motion for a directed verdict, we will state the facts and circumstances favorable to plaintiff as shown by the evidence and give to plaintiff the benefit of all reasonable inferences which may be fairly drawn therefrom. We shall disregard defendant's evidence, unless it aids the plaintiff's case.

Price v. Nicholson, Mo., 340 S.W.2d 1, 4, 5; Johnson v. Missouri-Kansas-Texas Railroad Company, Mo., 334 S.W.2d 41, 42; Thaller v. Skinner & Kennedy Company, Mo., 315 S.W.2d 124.

In reviewing this contention that plaintiff failed to make a submissible case, we confine ourselves to the issues submitted in plaintiff's Instruction No. 1, which we will set out later, and determine whether the evidence offered was sufficient to make a submissible case under the theory of liability submitted. Thaller v. Skinner & Kennedy Company, supra; Blankenship v. St. Joseph Fuel Oil & Mfg. Co., 360 Mo. 1171, 232 S.W.2d 954; Guthrie v. City of St. Charles, 347 Mo. 1175, 152 S.W.2d 91, l. c. 95.

Defendant admitted that he was the owner of the property known as Grants Farm. While defendant seems to assert that the evidence is insufficient to show that he is the operator of the amusement and show facilities conducted on said Farm, we will, for the purpose of our discussion in connection with the contention raised by defendant, assume that he operated the facilities and that all of the employees thereon and referred to in the evidence were under his supervision and control.

Grants Farm consists of a zoo wherein is displayed various animals, some of which by nature are designated as wild and some of which are designated as naturally tame. In addition, there seems to have been a park area and a carriage house where types of carriages and transportation vehicles of ancient vintage and of another age were on display. Among the animals displayed, with which we are concerned in this case, were two elephants and six miniature mules. The mules were attached and hitched to a small wagon or cart which was silver in color and had wheels which were described as having small spokes and instead of rubber tires, had a steel band around the outside of each wheel between three and four inches in width. Plaintiff's evidence showed that these mules did not

wear blinders which would serve the purpose of reducing the area visible to the mules.

On June 30, 1960, at approximately 1 P.M., the plaintiff, no doubt in a state of high expectancy and joy, which was later to be changed by misfortune, in the company of a relative and some twenty other persons of the Kempt Drive Improvement Association visited Grants Farm. Prior to this date the secretary of the improvement association had procured permission for the group to attend and visit Grants Farm. The evidence does not show with whom the secretary made these reservations or obtained this permission but does show that an entrance permit was necessary for an escorted tour around the grounds. There was no admission charge made. Approximately 200 people were in attendance that day, most of whom were children, and it appears upon reaching Grants Farm that the group plaintiff was with was escorted to a miniature train, on which they were taken for a ride through the park to an animal display. After viewing the animals, the group was then taken to the carriage house and from the carriage house they were escorted into a sort of courtyard in which there was a concession stand. It seems that the plaintiff had some refreshments at this stand for which no charge was made. When the group got off of the miniature train and was in line preparatory to entering the coach house where the coaches were on display, the miniature mules, heretofore described, hitched to the wagon, were standing in the courtyard. These miniature mules were variously described by the witnesses as horses, little horses, and donkeys. One of the ladies in plaintiff's group said that while she was waiting to get into the coach house saliva was coming from the mouth of the "front horse." It appears that the day was very hot. After the group went through the coach house and had refreshments and came out into the courtyard, someone in the group suggested taking a picture of the children. The children were placed

alongside of the little wagon, heretofore described, in order to have the picture taken. Shortly after the picture was taken by a member of the improvement association group, the elephant trainer, an employee at Grants Farm, brought two elephants into the courtyard from the stable through a doorway in front of the mules and wagon, the larger of the elephants being six to seven feet tall. This doorway to the stable was 5 or 6 feet in front of the mules and, therefore, the elephants passed no more than 5 or 6 feet in front of them when they were standing in the courtyard. One of plaintiff's witnesses testified that the elephants were snorting and making noises and throwing up their trunks as they came out. Various descriptions were given by plaintiff's witnesses as to what happened thereafter. However, the substance of their testimony is that the miniature mules bolted and ran and in doing so one of the mules stepped on plaintiff and one wheel of the wagon passed over plaintiff's leg inflicting a substantial injury.

The courtyard where the incident took place was described as being large and the size of the crowd of people, as heretofore stated, was about 200 in number. Most of them were children. Some of the people were in the coach house, some were at the concession stand and others were at various places in the courtyard. As one witness said, "everyone was scattered all around." Plaintiff was encouraged by the relative who had accompanied her to have her picture taken with the improvement association group. This relative of plaintiff testified that the crowd was very orderly.

Edgar J. Miller testified in plaintiff's case as an expert in the care and handling of horses. He was 31 years of age and at the time of his testimony he had been employed at the Daniel Auto Sales. It is unnecessary to detail his testimony in connection with his experience and background in the care and handling of horses, except

to point out that he admitted he had never "examined, trained, raised, bought, owned or sold miniature mules," but did say that he had experience with other mules. When asked his opinion about the temperament of a mule, a miniature mule or horse, he answered: "Generally speaking, they are similar in nature. Some are more docile than others because of care, but I think a mule has a reputation of being more docile than a horse, but at the same time more stubborn. But generally speaking their natures or excitabilities are the same." He said he would not approach the care and handling of a horse in any different way than he would a mule but would handle and care for both animals in the same way.

In a hypothetical question propounded to him in which he was asked to assume some of the circumstances surrounding the miniature mules at the time they bolted, he was asked to further assume, "that while stopped and posed elephants suddenly appeared making noises and coming very near to the place where the animals were standing, and assume further that there were noises made from the large crowd, and assume further that these horses bolted and ran forward, pulling the wagon, * * *. Can you state in your opinion under the circumstances of your experience whether such horses would be prone to be highly nervous, excitable, and have a propensity to bolt, and further whether a person experienced in handling horses and teams of horses and maintaining such horses should and could have known such condition of the animals?" He answered, "With all these circumstances that are cited, one should know or expect the animals to react in an unpredictable manner, and any one of these circumstances or the combination of several or all would cause something like this to happen, or even other combinations or other circumstances. * * * Q. From your experience in handling horses individually or in teams, is the nature of horses such that they are excitable and with propensi-

ties to act unpredictably? * * * A. Well, they have a propensity to act unpredictably *only insofar as there are unusual circumstances.* Any change of a common flow of noise or actions—they would have a propensity to act unpredictably *when there are strange or new circumstances or sounds around them.*" He was then asked if the sudden bellowing of elephants could be such a circumstance and he answered, "Yes, it is *possible.*" (Emphases ours.) In his cross-examination he admitted that animals become used to some things when they do them frequently. He further admitted that you could train horses to get along with elephants and that you could train horses to stand still in the company of elephants. He admitted that "a horse can get to the place that he is used to the bellowing of an elephant."

We relate some of the testimony given by defendant's witnesses because we feel it pertinent to a discussion of the contention under review. Two of the witnesses, employees of defendant, were tour guides who conducted the visitors around in the miniature train. Both had seen the elephants and the mules together in the courtyard many times when they were in visual contact with each other. Neither had ever seen the mules shy, bolt or run away at any time upon seeing the elephants. The elephant trainer testified that on the 30th day of June, 1960, there were two elephants, the oldest one named Tessie he had 13 years and was about 6 feet 10 inches in height at the time of the accident. The smallest and youngest elephant was named Peggy. He was acquainted with the miniature mules at Grants Farm, having been there when they were born. He said he had exhibited the elephants in the courtyard with the miniature mules many times and on many occasions prior to the 30th day of June, 1960. When he brought the elephants into the courtyard on the day of the incident, he was walking alongside of them and said the children would shout and yell when he brought the elephants into the courtyard. He did not see the accident take place.

The handler and driver of the miniature mules on the day the incident took place testified that it was a part of his job to drive these miniature mules. He had helped to train the miniature mules and harnessed them on the day in question and put blinders on them. He parked the wagon with the mules in the courtyard and had set the brake, which is a foot brake, and was sitting on the wagon with the reins in his hands, with the mules standing still. He said he had done this on many prior occasions and had the mules in the courtyard on occasions prior to the 30th day of June, 1960, when the elephants were in there and the mules never did bolt or run off before. He said he had not noticed the elephants until the mules suddenly started running with the wagon and brought them to a stop within about 40 or 50 feet. He did not see the plaintiff hit. He did not hear the elephants snort and he did not know why the miniature mules bolted and ran off. He did not remember whether he had warned any of the people not to get too close to the mules and said that the mules could easily pull the wagon with the brakes on. He said he was the only one who handles the mules and that he would describe their condition on that day as normal and that they were not particularly restless. He said that there was no more noise than usual on that particular day and that it was "just an average day."

■ Missouri decisions classify persons who enter upon land in the possession of another as trespassers, licensees, and invitees. Richey v. Kemper, Mo., 392 S.W.2d 266, 268. Plaintiff in her brief assumes, without any demonstration or explanation, that she was an invitee. However, her evidence fails to support this legal status. In the case of Richey v. Kemper, supra, the court said: " '[T]he real test of the

status of invitee (to whom the owner has the duty to take ordinary care to prevent his injury) is the purpose of his visit. * * * One cannot be declared the invitee of the person sought to be held liable, for failure to exercise due care to prevent his injury, unless he was there for some purpose of *real benefit* or *interest* to such person.'" (392 S.W.2d 1. c. 268.) Also, see Gruhalla v. George Moeller Construction Co., Mo.App., 391 S.W.2d 585. There is no evidence in the record before us to show that plaintiff's visit was of real benefit or interest to defendant and we are not permitted to speculate or guess in this area. Plaintiff has the burden of showing that her presence on the premises would result in some real benefit or interest to the defendant. Gruhalla v. George Moeller Construction Company, supra.

In the case of Richey v. Kemper, supra, the circumstances of plaintiff's visit to the premises were somewhat similar to the circumstances present in the instant case. In that case plaintiff was declared to be a licensee. In such a legal relationship the owner of land is liable only for "wanton or wilfull" acts or "active negligence." Richey v. Kemper, supra, 1. c. 268. Gruhalla v. George Moeller Construction Co., supra.

However, it is certain that plaintiff was not a trespasser and, therefore, under the circumstances which caused her injuries it makes no difference whether she was an invitee or licensee because of the affirmative or active nature of the act charged and if the act causing plaintiff's injury was due to the active negligence of defendant he would be liable to plaintiff, though she was a mere licensee. White v. Burkeybile, Mo., 386 S.W.2d 418.

The only theory of liability submitted to the jury by plaintiff was contained in her Instruction No. 1, the pertinent part of which reads as follows:

"The Court instructs the jury that if you find and believe from the evidence that on or about the 30th day of June, 1960, plaintiff entered onto Grants Farm at the invitation of August A. Busch, Jr.; and if you further find that elephants passing within approximately five feet of the mules mentioned in the evidence, while the elephants were snorting and throwing their trunks and while children present in the crowd of people were yelling, was such an *unusual* noise and commotion that in the exercise of ordinary care the defendant knew or should have known that it could be reasonably anticipated that said mules would be excited and would bolt and run; and if you further find by the exercise of ordinary care defendant could have reasonably anticipated that said bolting and running of said mules would cause the plaintiff to be injured; you are then instructed that it was the duty of the defendant to warn plaintiff of such danger and defendant's failure to so warn the plaintiff was negligence as defined in these instructions. * * *." (Emphasis ours.)

We omit the second paragraph of plaintiff's instruction because it merely instructed the jury that if it found the aforesaid facts to be true and "further find that defendant failed to exercise ordinary care in warning the plaintiff as above mentioned" then it was told to find in favor of plaintiff if it found that plaintiff was injured as a direct result of the negligence of defendant.

Concisely stated, plaintiff's theory of recovery seems to be that the snorting and action of the elephants and noise of the crowd created an unusual noise and commotion and because of this defendant could and should have known and anticipated that the mules would be excited and would bolt and run, and possessed of this knowlege and duty to reasonably anticipate that the mules would get excited and

would bolt and run, defendant had a duty to warn plaintiff of this danger. We have some difficulty in recognizing the theory of law under which plaintiff predicates her right to recovery. In this case the injury to plaintiff resulted, not from the action and the noise of the elephants and the noise of people, but from the action of the mules when they bolted and ran away. Under the cases, which we shall cite later, defendant is only liable when scienter is established on the part of the owner and keeper of a domestic animal of its vicious or mischievous tendencies or its tendency to run away or of a tendency through its actions to injure persons.

■ However, assuming, without so holding, that plaintiff has submitted a theory in her Instruction No. 1 under which she can legally recover, her evidence fails to support the necessary finding that the snorting and action of the elephants and noise of the crowd on June 30, 1960, were unusual. Not one bit of evidence was produced by the plaintiff to show that on prior occasions the elephants did not snort and throw up their trunks and that the noises of the crowds were any different in volume or otherwise than the circumstances in connection with these matters that took place on June 30, 1960. There was no evidence from which a jury could make a finding that the "noise and commotion" on that day was "unusual." The only evidence concerning these matters as to prior occasions showed that what happened June 30, 1960, was not unusual but was usual and, as one witness put it, there was no more noise than usual on that particular day and that it was "just an average day."

Further, the gist of the testimony of plaintiff's alleged expert witness (we question the propriety and need of this type of testimony in this case) is that horses and mules have a propensity to act unpredictably when there are unusual or new circumstances or sounds around them to which they are not accustomed. He admitted that you could train horses and mules to get along with elephants and that you could train them to stand still in the company of elephants. He further admitted that they can get used to the bellowing of an elephant. As we have pointed out, there was not one bit of testimony to show that these circumstances on this particular day were unusual or that they were strange or new. The only evidence in this regard shows that there was no more noise than usual; that it was "just an average day"; that the elephants and the mules had been in visual contact with each other many times before; that the elephants and the miniature mules had been exhibited together in the courtyard many times and on many occasions prior to June 30, 1960, and that the mules never had been seen or known to shy, bolt or run away.

Plaintiff has failed to cite in support of her contention, a single case that involved a situation where a domestic animal such as a horse, mule or donkey bolted and ran away.

■ That the mule is a domestic animal is beyond argument. The distinction between the liability of the owner of domestic animals which are naturally tame, such as horses, mules, cattle, goats, sheep, dogs and the like, and the owner or keeper of animals that are naturally wild and savage is well understood and needs little discussion. In respect to the wild and savage beast the owner is generally presumed to have notice that they are vicious and possessed of dangerous characteristics and, therefore, a different theory of liability is imposed if someone is injured by a wild animal. However, in the case of a domestic animal, there is no such presumption and its owner or keeper is liable for its actions only in case it was in fact vicious, mischievous or possessed of a tendency through its actions to injure persons and the owner or keeper had knowledge, either actual or constructive, of these tendencies and inclinations.

The early case of Bell v. Leslie, 24 Mo. App. 661, was an action to recover damages for injuries to plaintiff's race horse which were sustained when defendant's race horse ran away. The court said at l. c. 668:

"If the mare was unsafe and dangerous for such purposes it was by reason of a vicious disposition peculiar to herself. The burden of proving such vicious disposition and the knowledge thereof by the defendant rested upon the plaintiff.

\*    \*    \*    \*    \*

"Did the mare have a disposition to run away? As we have said, it devolved upon the plaintiff to prove such disposition. The only evidence introduced by the plaintiff touching the mare's disposition was the testimony of the plaintiff that the mare was 'unruly.' \* \* \* It devolved upon the plaintiff to prove that the mare was 'unruly' in that she was disposed to run away, because the accident was caused by the mare running away. \* \* \*"

The court in discussing the applicable rule concerning injuries caused by domestic animals, said:

"The language used by the court in Spring Co. v. Edgar (99 U.S. 645, 25 L. Ed. 487 supra) applies with peculiar appropriateness to the facts of this case. The court said: 'Domestic animals, such as oxen or horses, may injure the person or property of another, but courts of justice invariably hold that if they are rightfully in the place where the injury is inflicted, the owner of the animal is not liable for such an injury, unless he knew that the animal was accustomed to be vicious; and in suits for such injuries such knowledge must be alleged and proved, as the cause of action arises for the keeping of the animal after the knowledge of its vicious propensity.' "

In the case of Bell v. Leslie, supra, the court held there was absolutely no evidence tending to show that the defendant knew that his mare had run away before or was predisposed to do so.

In a recent case (1961) decided by the Supreme Court, Humes v. Salerno, Mo., 351 S.W.2d 749, the plaintiff brought suit for injuries sustained by him when he was bitten by defendant's horse while he was exercising the horse for the defendant. The Supreme Court, after reviewing the evidence and pointing out that "[r]ace horses are spirited and temperamental, even unpredictable, stallions more so than mares and geldings," then said (351 S.W.2d l. c. 751):

"It is not necessary at this point to search out other evidence, in these circumstances, as the jury could and did find them, Sal's Son was a vicious horse (Merritt v. Matchett, 135 Mo.App. 176, 115 S.W. 1066; Maxwell v. Fraze, Mo.App., 344 S. W.2d 262), and the only question is whether there is also evidence from which the jury could reasonably draw the inference that Dr. Salerno had actual or constructive knowledge of the fact. State ex rel. Kroger Co. v. Craig, Mo.App., 329 S. W.2d 804, 809; Clark v. Missouri, K. & T. Ry. Co., 179 Mo. 66, 77 S.W. 882; Alexander v. Crochett, 233 Mo.App. 674, 124 S.W.2d 534. In addition to these cases, other cases and the general rules are set forth and collected in Clinkenbeard v. Reinert, 284 Mo. 569, 225 S.W. 667, 13 A.L.R. 485; Rolleg v. Lofton, Mo.App., 230 S.W. 330; 3 C.J.S. Animals § 148, p. 1248; 2 Am.Jur. Animals, Sec. 48, p. 728 and the annotations 15 A.L.R.2d 1313, 17 A.L.R.2d 459."

After further examining the evidence the court said (351 S.W.2d l. c. 752):

"In all these circumstances the jury could reasonably draw the inference of knowledge of the horse's vicious propensities on the part of the doctor. Merritt v. Matchett, supra. \* \* \* 'It is not essential to the owner's liability that he should have notice of the particular sort

of act which produces the injury by an animal in a case like this. He must not wait until his dog bites somebody before taking notice of his dog's conduct, where it has been such as to warn a man of ordinary prudence that the animal is ferocious or vicious in disposition.' O'Neill v. Blase, 94 Mo.App. 648, 667, 68 S.W. 764, 770."

■ The rule recognized in personal injury actions occasioned by dogs is that " 'the gist of the action is the keeping of a vicious dog after knowledge of his vicious propensities.' " State ex rel. Kroger v. Craig, Mo.App., 329 S.W.2d 804, 1. c. 809.

And we add that the rule applies to domestic animals of all kinds that have a tendency to run away or through their actions to injure other persons. This rule of liability was expressed by Moses, as pointed out in some of our Missouri decisions, and may be found in Exodus Chap. 21:28, 29, 30.

■ As we have pointed out heretofore, we have some difficulty in recognizing the theory under which plaintiff predicates a right to recovery. However, it is clear from the decisions of this state that there can be no recovery for the injuries inflicted by the mules in the instant case until plaintiff produces proof that the owner of said mules knew, either actually or constructively, of a habit or tendency of the mules to run away. As we have pointed out, there is no such proof in the record in this case, as well as no proof to show that the circumstances facing the mules on June 30, 1960, were unusual.

Plaintiff sustained a fairly substantial injury in this case. However, a judgment cannot be sustained on sympathy and sentimentality and inasmuch as the record evidence in this case shows that plaintiff failed to make a submissible case for the jury, we are compelled to reverse the judgment. It is so ordered.

ANDERSON, J., and FRANK D. CONNETT, Jr., Special Judge, concur.